## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CAROL TOMAO,                          )
                                      )
              Plaintiff,              )
                                      )
      v.                              )   No. 04 C 3470
                                      )
ABBOTT LABORATORIES, INC.,            )   Judge Nan R. Nolan
                                      )
              Defendant.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Carol Tomao has filed suit alleging that Abbott Laboratories ("Abbott"), incorrectly named as Abbott Laboratories, Inc., failed to hire her as an Asset Technician and terminated her position as a contract Asset Technician because of her age and disability in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Tomao also claims that Abbott retaliated against her for complaining about the unlawful discrimination, and that she relied to her detriment on Abbott's promise of a job. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Defendant now seeks summary judgment on all of Tomao's claims. For the reasons explained here, the motion is granted in part and denied in part.

## BACKGROUND[1]

Tomao was born on November 9, 1937 and was over 60 years of age at all times relevant to this action. Tomao's daughter, Denise Bauer Weil, began working at Abbott in 1989, and by 2000, she was a Section Manager in the North Chicago Maintenance Department. Sometime prior to January 19, 1998, Weil informed Tomao that Abbott was looking for a contract Asset Technician

---

[1]      Abbott has moved to strike many of Tomao's responses to its statement of material facts, and several of Tomao's statements of additional fact. To the extent the court does not address a fact in this opinion, the relevant motion is granted. Otherwise, both motions are denied.

for its North Chicago, Illinois plant. (Pl. Facts ¶¶ 1, 2; Weil Dep., at 7-8.)[2] On January 19, 1998, Mullins & Associates ("Mullins"), an employee placement and search company, hired Tomao to work as a contract laborer on assignment at Abbott. (Def. Facts ¶ 1.)[3] Tomao was assigned to work as a contract Asset Technician responsible for inventorying and tagging new equipment or new parts of equipment, and then inputting that information into a computer database for accountability. (Id. ¶ 3.)

In addition to Tomao, Abbott employed two other Asset Technicians, Marlene Schroeder (born September 22, 1961) and Theresa Streib (born August 22, 1964). Both women were permanent Abbott employees, though Streib began her tenure at Abbott as a contract laborer. (Id. ¶ 4; Pl. Resp. ¶ 4.)[4] The North Chicago plant was divided into three zones for asset administration purposes, and each Asset Technician was assigned to one of those three zones. (Id.) All of the Asset Technicians, including Tomao, performed the same duties and reported directly to William Whitaker, Abbott's Asset Administration Group Leader. Whitaker, in turn, reported to Senior Supervisor Terry Johnson until approximately July of 2000, when Johnson was replaced by George Edward Shorman. The Senior Supervisor reported to Abbott's Section Manager, who was at all relevant times David Taylor. (Id. ¶ 2; Pl. Resp. ¶ 2.)

When Tomao was first assigned to Abbott, Terry Johnson told her that as long as she performed the necessary work, the company would convert her to a permanent Abbott employee

---

²      Plaintiff's Local Rule 56.1 Amended Statement of Additional Material Facts is cited as "Pl. Facts ¶ __." Abbott has not responded to any of these statements, aside from moving to strike nine of them. The remaining 80 assertions are therefore deemed admitted for purposes of the summary judgment motion. See Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.") The court notes that many of these assertions are repeated in Tomao's response to Abbott's statement of facts.

³      Abbott's Statement of Material Facts is cited as "Def. Facts ¶ __."

⁴      Plaintiff's Local Rule 56.1(b)(3)(A) Response to Defendant's Statement of Material Facts is cited as "Pl. Resp. ¶ __."

2

once such a position became available. (Pl. Resp. ¶ 67; Pl. Facts ¶ 5.) Tomao viewed this as an offer of employment. (Def. Facts ¶ 68.) Whitaker similarly told Weil that he "couldn't wait to hire Carol." (Weil Dep., at 63-64.)

## A. Tomao's Disability

In June 1999, Tomao was diagnosed with lupus. She remained able to perform her job, however, including climbing and getting around the grounds. She began receiving treatment at Lake Forest Hospital but, when that proved unsuccessful, she transferred her care to the University of Chicago Hospital in November 2000.[5] (Id. ¶¶ 8, 9; Pl. Facts ¶¶ 7, 9.) At that time, Tomao informed Whitaker of her condition, explained that she would need to be absent from work for medical treatment once a month, and provided him with doctor's notes. Whitaker told Tomao to send him an email message the day before each treatment to remind him. Whitaker also frequently asked Tomao, "Are you sure you're up to this [your job]?"; referred to her as "granny" or "grandma"; and told her that "we're not getting any younger." (Id. ¶ 9; Pl. Facts ¶¶ 7, 11, 15, 16.)

In addition to Whitaker, several other Abbott managers were aware of Tomao's condition. David Taylor knew that Tomao had to go for regular medical treatments and he commented to her on occasion that "I understand, you know, sometimes it seems all right. And then all of a sudden it comes back again." (Pl. Facts ¶¶ 10, 13.) Taylor also asked Weil about the symptoms of lupus, whether the medications Tomao was taking could make her bones brittle, and whether Weil thought Tomao could pass the company physical. Lynne Faragher, Abbott's Human Resources Manager from approximately March 2001 to January 2004, similarly knew that Tomao needed time off for her lupus treatments and instructed Whitaker and/or Shorman that any accommodation was "up to them." (Id. ¶¶ 12, 20.)

---

[5]     Sometime thereafter, Tomao was also diagnosed with several other autoimmune diseases, including Rheumatoid arthritis, Sjogren's disease, myositis, Hughes disease, asthma, fibromyalgia, and Raynold's syndrome. (Pl. Facts ¶ 9.)

Tomao insists that her absences for medical treatments did not affect her job performance, and that she had her co-workers save her work for her so that she was "able to catch up and keep everything in line." (*Id.* ¶¶ 7, 11, 15, 16.) Tomao acknowledged, however, that the medication she took for the illness caused her skin to become thin, and that on a few occasions, "people . . . freaked out" when she ran into something and started bleeding profusely. (Tomao Dep., at 35.)

## B.    The Asset Technician Position

In March 2001, Taylor asked the supervisors of his section to prepare Business Plans to help him better understand the objectives of each group. (Pl. Resp. ¶ 10.) Shorman claims that his plan called for reducing the number of Asset Technician work zones from three to two and reassigning the third Asset Technician to focus primarily on preventative maintenance. According to Shorman, this restructured Asset Technician position would require an employee with strong mechanical and industrial experience. (Def. Facts ¶¶ 10, 11, 23.) Tomao agrees that Shorman's Business Plan referred to "future centralized asset management," but notes that the plan said nothing about changing the number of Asset Technicians, or hiring a permanent person for Tomao's contract position. (Pl. Resp. ¶¶ 10, 11.)

In any event, it is undisputed that sometime in 2001, Shorman obtained "head count" for the Asset Technician position, meaning that he was allowed to hire a permanent employee as opposed to relying on a contract laborer. (Def. Facts ¶ 12.) According to Taylor, Abbott decided to convert the contract position to a permanent one because "it had sustained the volume and could support a full-time regular employee." (Taylor Dep., at 61; Pl. Facts ¶ 21.) Shorman claims that he at all times intended to eliminate Tomao's contract position and hire a permanent Abbott employee. Shorman did not, however, notify Tomao that her contract position would expire. Nor did he provide Mullins with any such advance notification. (Def. Facts ¶ 12; Pl. Resp. ¶ 12.)

4

Instead, in January 2002, Shorman posted a requisition for a permanent Asset Technician position. (*Id.* ¶ 13; Pl. Facts ¶ 21.) The job description required that applicants have a high school diploma or equivalent; a minimum of two years maintenance office experience; familiarity with Computerized Maintenance Management Systems ("CMMS"); effective telecommunication skills; good interpersonal and documentation skills; ability to maintain professional working relationships; knowledge in operating Lotus Notes or a similar email system; ability to work independently; and a valid driver's license. (Whitaker Dep., Ex. 13, at ABBT 00077.) Shorman's additional requirement that an individual have strong mechanical and industrial experience does not appear on the job description. (*Id.*; Pl. Facts ¶ 42.)

Abbott claims that the job posting was internal and only available to current Abbott employees, and not contract laborers. To be considered for the position, Abbott says, employees were required to submit their resumes electronically to the recruiter, Daniel Fletcher, who then produced a short list of potential candidates for consideration by the hiring manager, Shorman. (Def. Facts ¶ 18-20.) Whitaker initially interviewed the following Abbott employees: Thomas Pataska, Ira Phillips, Carl Robinson, and Kenneth Alexander. Based on those interviews, Whitaker believed that Pataska had the desired industrial mechanical experience and strong communication skills needed for the Asset Technician position. (*Id.* ¶ 24, 26, 28.)

## C. Tomao's Interview and Termination

The parties dispute whether Tomao was eligible to, and did in fact apply for the Asset Technician position. Shorman claims that on December 7, 2001, he extended Tomao's contract through March 2002. (*Id.* ¶ 53.) At the time of the January 2002 job posting, Tomao was off work on a medical leave due to a December 28, 2001 workplace foot injury. Taylor and Shorman were concerned that Tomao, who needed to use crutches, might injure herself and instructed her to remain at home until she was able to walk unassisted. (Pl. Facts ¶ 17; Def. Facts ¶ 14.) At

5

Tomao's request, however, Taylor and Shorman allowed her to perform some work at home between February and early March 2002 on a company-provided laptop computer. (*Id.* ¶¶ 18, 25; Def. Facts ¶¶ 15, 16.) Tomao insists that she applied for the Asset Technician position sometime prior to March 27, 2002 in an online process. (*Id.* ¶ 25; Pl. Resp. ¶ 21.)

Abbott denies receiving Tomao's application, noting some handwritten notes from an Equal Employment Opportunity Commission ("EEOC") investigator indicating that Tomao said she did not submit an on-line application. (Mot. Strike Add'l ¶ 25; Fletcher Dep., at 58; Def Facts ¶ 32.) Abbott insists, moreover, that Tomao was not eligible for the position because she was a contract laborer and not an Abbott employee. Abbott also states that it has a company policy prohibiting relatives from working together in an organization that reports to the same vice president, and the Asset Technician was reporting to the same vice president as Tomao's daughter. (Def. Facts ¶ 34.) According to Tomao, however, her daughter told David Taylor in late 2001 that she would be resigning her management position with Abbott early the next year. (Pl. Resp. ¶ 34; Weil Dep., at 44.) Taylor then told both Whitaker and Shorman that Tomao should be considered for the Asset Technician position. (Taylor Dep., at 59, 122-23.) On February 14, 2002, Weil provided a formal written resignation to Dan Fruehe, who similarly confirmed that Tomao would thus be eligible for the Asset Technician position. Moreover, Faragher and Whitaker both testified that they were aware of two brothers, Billy and Floyd Orrik, who reported to the same Abbott manager. (Pl. Resp. ¶ 34.)

On March 27, 2002, Whitaker sent Tomao an email at Shorman's instruction stating that he would be sending her "an invitation for a 'formal' interview for the Asset Tech position." (Email from W. Whitaker to C. Tomao of 3/27/02, Whitaker Dep., Ex. 2.) The next day, Whitaker did interview Tomao, though Shorman characterizes it as a mere "courtesy interview." (Def. Facts ¶¶ 30, 31.) During the interview, Whitaker declined to accept or review Tomao's proffered resume, nor did he ask her any questions about the details of the Asset Technician position; her industrial

maintenance experience; her work history; her experience reviewing blueprints; or her training experience. (Pl. Resp. ¶¶ 27, 57; Pl. Facts ¶¶ 33, 34.)

Whitaker did ask Tomao if she thought she was physically capable of performing the duties required of the Asset Technician position, and "[w]ell, do you think you'll be able to go out there and climb around anymore . . ." When Tomao responded in the affirmative, Whitaker said that "we all like to feel as if we can do the things we were able to do when we were younger." (Id. ¶ 37; Def. Facts ¶ 37; Pl. Facts ¶¶ 29, 30.) Whitaker also told Tomao about Pataska (born September 5, 1973, non-disabled), whom Whitaker believed had a great deal of electrical and mechanical ability. (Def. Facts ¶ 39.) When Whitaker asked Tomao how long she planned to stay at Abbott, Tomao assured him that she planned to work past retirement age. At the end of the interview, Tomao understood that Pataska would be getting the Asset Technician position, and that Whitaker wanted her to train him. As Whitaker explained, "it would be valuable for her to stick around and train the person that did get the job . . . [s]o that all the knowledge that she had gained up to that point wouldn't be lost and have to start all over again." (Id. ¶ 41; Pl. Resp. ¶ 37; Pl. Facts ¶ 32; Whitaker Dep., at 115.)

After the interview, Tomao was upset and tried to contact HR Manager Lynne Faragher and David Taylor to complain. Reaching neither individual, Tomao left work one hour early and, later that evening, told her daughter what had happened. (Id. ¶¶ 42-44; Pl. Resp. ¶ 44.) The next day, Tomao called Whitaker to say that she would not be at work because she was too upset and felt "betrayed." (Whitaker Dep., at 131.) Weil, however, met with Faragher to discuss her mother's interview. Faragher assured Weil that she took the situation seriously and would investigate it immediately. (Pl. Resp. ¶ 43.)

Tomao was off work on April 1, 2002 for a scheduled lupus treatment, and when she returned to work on April 2, Faragher called and instructed her that any complaints needed to go through the chain of command at Mullins. (Id. ¶ 44; Def. Facts ¶ 44; Tomao Dep., at 107-08; Pl.

Facts ¶ 52.) When Tomao got home from work that day, she found a telephone message from Mullins informing her that her contract with Abbott had been terminated effective April 3, 2002 and that she was not to return to Abbott's property. (Def. Facts ¶ 45.) According to Terri Mullins, the agency was not notified that Tomao's contract would end until the day Abbott terminated it in April 2002. (Pl. Resp. ¶ 12; Mullins Aff. ¶ 3.) In addition, Whitaker expected Tomao to be at work on April 3 and did not learn until shortly thereafter that her contract had been terminated. (Whitaker Dep., at 127-28.)

After the termination, Tomao was not permitted to return to Abbott to retrieve her belongings or say goodbye to co-workers. Instead, Abbott cut Tomao's lock off her locker and made her pick up her belongings off-premises. (Pl. Facts ¶ 56.) According to HR Manager Faragher, that procedure was generally reserved for employees who had engaged in criminal or fraudulent behavior. (Faragher Dep., at 159-64.)

### D. Abbott's Decision to Hire Pataska

As indicated, Shorman selected Pataska for the permanent Asset Technician position, relying on a recommendation from Whitaker. (Def. Facts ¶ 58; Pl. Facts ¶ 37.) In that regard, Whitaker prepared a Candidate Pool Review form ("CPR") stating his specific comments about the Asset Technician candidates and the reasons they were or were not selected. (Whitaker Dep., Ex. 5.) Whitaker indicated that he selected Pataska due to his experience training new personnel; his mechanical and electrical industrial maintenance experience; his blueprint interpretation skills; his good Microsoft Office experience; and his initiative in furthering his education by working towards a Bachelor of Arts in Communications. (Id.) Whitaker did not inquire about Pataska's attendance record, or about the gap in employment on his resume from December 1994 to June 1996. (Whitaker Dep., at 283; Pl. Facts ¶ 80.)

8

With respect to Tomao, Whitaker stated that she was not selected due to "Attendance" and "Experience," and noted that she had "[h]igh attendance incidents" and "good knowledge of current role but lacks experience needed for future expectations." (Whitaker Dep., Ex. 5.) With respect to Tomao's attendance, Whitaker testified that he wanted an Asset Technician he "knew would be there every day. Carol's attendance record regardless of whether or not they were legitimate excuses, her attendance record was not admirable enough to indicate that she would be there every day. . . . . [T]he fact that she was not there when she was supposed to have been there on those times made it hard to believe that she would be there when she was supposed to be there at a future date." (Whitaker Dep., at 138-39.) Though he did not include further information on the CPR, Whitaker admitted that he knew Tomao had experience reading blueprints. Shorman also admitted that Tomao had good Microsoft Office experience. (Pl. Resp. ¶ 57.)

Based on Whitaker's recommendations, Shorman interviewed Pataska for the Asset Technician position. Shorman stated that he did not interview Tomao because he felt that Whitaker's interview was sufficient. (Shorman Dep., at 111.) Shorman testified that he chose Pataska because of his mechanical experience and technical writing skills, though the CPR says nothing about writing skills. (Id. at 164.) Shorman admitted, moreover, that from the time Pataska started as an Asset Technician through the time that Asset Technicians were consolidated into another business unit, Pataska did not in fact need any mechanical knowledge or experience to perform the job. (Id. at 142.)

After interviewing Pataska, Shorman met with Taylor and read him Whitaker's comments from the CPR. Relying on Shorman's recommendation, Taylor approved Pataska for the job. (Pl. Facts ¶ 45.) Pataska did not begin working as an Asset Technician until June 2002. Abbott claims that the workload "had diminished to the point that between April 2, 2002, which was Tomao's last day as an Asset Technician, and June 3, 2002, which was Pataska's first day as an Asset Technician, the two remaining Asset Technicians were able to handle all the work." (Def. Facts ¶¶

9

63, 64.) Tomao notes, however, that the reason behind hiring a permanent Asset Technician in the first place was that the volume of work could sustain a third full-time regular employee. (Pl. Resp. ¶ 64.)

### E. Tomao's Job Applications

After her contract position with Abbott ended, Tomao continued to apply for other positions in the company, without success. (Def. Facts ¶ 47.) In April 2002, Tomao submitted a resume to Mullins for employment with Abbott, but she does not know whether Mullins in fact forwarded the document to Abbott. (Tomao Dep., at 135-36, 139.) Tomao applied to Abbott on at least two occasions through an online process and received an October 30, 2002 letter from Abbott's Senior Counsel, Rita L. Martinez, stating that the company would forward her resume to the appropriate department if a position became available. No one from Abbott ever contacted Tomao, however. (Pl. Facts ¶ 66.) Since the time that Tomao's contract ended, Abbott has hired three Asset Technicians including Pataska, all of whom are at least 30 years younger than Tomao and not disabled. (*Id.* ¶ 69, 71.) One of those individuals, Sean Kaplan, started as a contract laborer in early 2002 and became a permanent hire in late 2002 or early 2003. (*Id.* ¶ 70.) In fact, recruiter Daniel Fletcher testified that it is not unusual for a contract laborer to be converted into a permanent Abbott employee in such a manner. (Fletcher Dep., at 25.)

### F. Tomao's Charge of Discrimination and Complaint

On January 8, 2003, Tomao filed a charge of discrimination with the EEOC and the Illinois Department of Human Rights. (Def. Facts ¶ 69.) In that charge, Tomao alleged that she was discriminated against on the basis of her age and disability when Abbott failed to hire her as a permanent Asset Technician and terminated her contract laborer position. The EEOC investigated these charges and issued a Notification of Right to Sue on February 20, 2004. Tomao filed this federal lawsuit approximately three months later on May 18, 2004, alleging similar claims of age

10

and disability discrimination, and asserting a retaliation claim and a state law claim for promissory estoppel.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; she must offer evidence sufficient to support a verdict in her favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Employment discrimination cases are inherently fact-intensive, but the court is not required to "scour the record" in an effort to assist the plaintiff in avoiding summary judgment. *Greer v. Board of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001).

Tomao claims that Abbott failed to hire her and also discharged her on the basis of her age and disability (lupus) in violation of the ADEA and ADA, respectively, and retaliated against her for complaining about the unlawful discrimination. She also claims that Abbott promised her the permanent Asset Technician position and that she relied on that promise to her detriment. The court addresses each argument in turn.

11

## I.   Failure to Hire

Tomao first argues that Abbott failed to hire her as a permanent Asset Technician because of her age and disability. Tomao may establish discrimination under the ADEA and the ADA using either the direct or indirect method of proof. Under the direct method, Tomao must either present direct evidence which, if believed by the finder of fact, "will prove the particular fact in question without reliance upon inference or presumption," or circumstantial evidence that establishes a "convincing mosaic" of discrimination. *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003).

Under the familiar *McDonnell Douglas* burden-shifting analysis, Tomao may establish a prima facie case of age discrimination by proving that (1) she is a member of the protected class (age 40 or older); (2) she applied for and was qualified for the position she sought; (3) Abbott rejected her; and (4) Abbott hired another similarly situated individual for the position who was substantially younger than Tomao. *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If Tomao succeeds in making out a prima facie case, the burden shifts to Abbott to articulate a legitimate, non-discriminatory explanation for the adverse employment action. If such a reason is offered, Tomao must show that the proffered reason is merely a pretext for age discrimination. *Id.* (citing *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003)).

With respect to the ADA, Tomao must establish a prima facie case by proving that (1) she is disabled within the meaning of the Act; (2) she applied for an available position for which she was qualified; and (3) that position was filled by a nondisabled person. *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995). Once these prima facie elements have been met, the burden-shifting analysis described above then applies. *Id.*

12

## A.    Direct Evidence

Tomao claims to have direct evidence of discrimination based on certain remarks Bill Whitaker made while interviewing her for the permanent Asset Technician position. For example, Whitaker asked Tomao if she was physically able to do the job, though she had been performing the same duties as a contract laborer for more than four years. When Tomao responded in the affirmative, Whitaker said that "we all like to feel as if we can do the things we were able to do when we were younger." (Def. Facts ¶ 37; Pl. Facts ¶¶ 29, 30.) In addition, Whitaker cited Tomao's attendance as one of the reasons she was not hired, and he knew that her absences were due to her lupus treatments. (Pl. Opp., at 16.)[6] Finally, Whitaker occasionally referred to Tomao as "granny" or "grandma."

Abbott argues that the ADA specifically allows employers to make "preemployment inquiries into the ability of an applicant to perform job-related functions." (Def. Reply, at 3 (quoting 42 U.S.C. § 12112(d)(2)(B).)[7] Abbott also notes that good attendance is a requirement of all employees, even disabled ones. (Id. at 4 (citing Nowak v. St. Rita High Sch., 142 F.3d 999, 1003 (7th Cir. 1998) ("[A]n employee who does not come to work cannot perform the essential functions of his job."); Murphy v. ITT Educational Servs., Inc., 176 F.3d 934, 939 (7th Cir. 1999) ("[I]in assessing plaintiff's attendance record, [employer] could and did reasonably decide as a matter of good business judgment, even considering plaintiff to be otherwise qualified, that plaintiff's attendance habits might not sufficiently adjust to the strict requirements of the outside sales representative position, and, in any event, did not merit the promotion.").) As for Whitaker's comments, Abbott notes that Whitaker himself was 52 years old at the time of Tomao's interview. In addition, Abbott

---

[6]    Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment is cited as "Pl. Opp., at ___."

[7]    Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment is cited as "Def. Reply, at ___."

characterizes the "granny" and "grandma" statements as mere stray remarks that were wholly unrelated to the employment decision. (*Id.* at 7 (citing *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403 (7th Cir. 1996).)

The court agrees that under the ADA, employers may inquire into a job applicant's ability to perform the required duties. That said, it is undisputed that Tomao had already been performing the duties of Asset Technician for four years. In addition, unlike the plaintiffs in *Nowak* and *Murphy*, who either did not attend work at all for a year and a half or sought a promotion to a position requiring stricter attendance, Tomao had regularly-scheduled lupus treatments and merely sought permanent employment in the same position she had held for four years as a contract laborer. In any event, the court need not decide whether Tomao has in fact offered direct evidence of discrimination because she has presented ample indirect evidence to support her claims.

## B. Indirect Evidence

Abbott does not dispute that Tomao is within both protected classes (over 40 and disabled) and that the company hired a younger, nondisabled person to fill the permanent Asset Technician position. Abbott insists, however, that Tomao was not qualified for the job, and argues that, in any event, she cannot demonstrate that Abbott's legitimate, nondiscriminatory explanation for not hiring her is a pretext for discrimination.

### 1. Qualification for the Job

Abbott claims that Tomao was not qualified for the permanent Asset Technician position because she never applied for the job and the job was only available to current Abbott employees, not contract laborers. (Def. Reply, at 8-9.) It is undisputed, however, that on March 27, 2002, Whitaker sent Tomao an email at Shorman's instruction stating that he would be sending her "an invitation for a 'formal' interview for the Asset Tech position." (Email from W. Whitaker to C. Tomao of 3/27/02, Whitaker Dep., Ex. 2.) The next day, moreover, Whitaker did interview Tomao in

14

Shorman's office. (Def. Facts ¶¶ 30, 31.) As for Tomao's status as a contract laborer, the evidence suggests that it was not unusual for Abbott to convert contract workers into permanent employees. (Fletcher Dep., at 25.) Indeed, permanent Asset Technicians Theresa Streib and Sean Kaplan both began their careers at Abbott as contract Asset Technicians. Tomao has sufficiently raised a question of fact as to whether she was eligible and qualified for the permanent Asset Technician position.

### 2. Pretext

Abbott next claims that Tomao cannot rebut the company's legitimate, non-discriminatory explanation for hiring Pataska – i.e., an honest belief that he had the industrial/mechanical experience and communication skills necessary for the position, while Tomao did not. (Def. Mem., at 9; Def. Reply, at 11.)[8] In making this argument, Abbott stresses that Shorman wanted the new Asset Technician to focus primarily on preventative maintenance. The posted job description, however, did not reflect this new emphasis. Nor did Whitaker ask Tomao about such skills during her job interview. Instead, Whitaker asked Tomao if she thought she was physically capable of performing the required job duties and "[w]ell, do you think you'll be able to go out there and climb around anymore . . ." When Tomao responded in the affirmative, Whitaker said that "we all like to feel as if we can do the things we were able to do when we were younger." (Pl. Resp. ¶ 37; Def. Facts ¶ 37; Pl. Facts ¶¶ 29, 30.) It is not clear how Abbott knew Pataska had better mechanical experience than Tomao when Whitaker never discussed such skills with her. Shorman admitted, moreover, that from the time Pataska started as an Asset Technician through the time that Asset Technicians were consolidated into another business unit, Pataska did not in fact need any mechanical knowledge or experience to perform the job. (Shorman Dep., at 142.) In addition, Whitaker wanted Tomao to train Pataska "[s]o that all the knowledge that she had gained up to that

---

[8]     Defendant's Memorandum of Law in Support of its Motion for Summary Judgment is cited as "Def. Mem., at __."

point wouldn't be lost and have to start all over again." (Def. Facts ¶ 41; Pl. Resp. ¶ 37; Pl. Facts ¶ 32; Whitaker Dep., at 115.)

Shorman claims that he chose Pataska not only for his industrial/mechanical experience, but also his technical writing skills. The CPR prepared by Whitaker, however, says nothing about writing skills. (Id. at 164.) Also troubling is the fact that Whitaker cited Tomao's attendance as a reason for not hiring her as a permanent Asset Technician. Whitaker, Shorman, and Taylor all knew that Tomao had regularly-scheduled absences for her lupus treatment. Yet Whitaker believed that

> Carol's attendance record regardless of whether or not they were legitimate excuses, her attendance record was not admirable enough to indicate that she would be there every day. . . . . [T]he fact that she was not there when she was supposed to have been there on those times made it hard to believe that she would be there when she was supposed to be there at a future date.

(Whitaker Dep., at 138-39.) Attendance is certainly an important job requirement, but Abbott has not offered any evidence suggesting that Tomao's absences interfered with her ability to perform her job in any way, or that she was ever disciplined or reprimanded for attendance issues. Nor is there any evidence that the attendance requirements of the permanent Asset Technician position differed from those of the contract position. Cf. Murphy, 176 F.3d at 939 (telemarketing employee's attendance was not sufficient for promotion to an outside sales position); Kolovos v. Sheahan, No. 97 C 4542, 1999 WL 1101919, at *7-8 (N.D. Ill. Nov. 30, 1999) (question of fact existed as to whether employer improperly considered job applicant's disability-related absenteeism where the absences were all excused and did not interfere with employee's job performance). Significantly, Whitaker never inquired into Pataska's attendance record at all.

Abbott finally insists that employees like Pataska are given preference for open positions over external job applicants. According to Abbott, "even if plaintiff's qualifications were comparable to Pataska's, Abbott's policies required that it select Pataska, a current employee, for the position." (Def. Reply, at 12.) Whitaker testified, however, that he did not give any preference to Pataska

16

based on his current employee status. (Whitaker Dep., at 215.) Viewing the facts most favorably to Tomao, there is a genuine issue of fact as to whether she did not receive the permanent Asset Technician position because of her age and/or disability.

## II. Termination

Tomao also claims that Abbott discriminated against her by terminating her contract Asset Technician position. To succeed on this claim under the ADEA, Tomao must first establish a prima facie case of discrimination by proving that (1) she is a member of the protected class (age 40 or older); (2) she was performing at a level that met Abbott's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated differently than younger, similarly situated employees. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 574 (7th Cir. 2003); *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 676 (7th Cir. 2002). If Tomao succeeds in making out a prima facie case, the burden shifts to Abbott to articulate a legitimate, non-discriminatory explanation for the adverse employment action. If such a reason is offered, Tomao "bears the ultimate burden of showing that it is a pretext for discrimination." *Schuster*, 327 F.3d at 574 (quoting *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002)). For purposes of the ADA, Tomao must prove that (1) she is disabled under the Act; (2) Abbott knew about her disability; (3) she was otherwise qualified for the job; and (4) she was terminated because of her disability. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999). "All that is necessary is that there be evidence reasonably suggesting that the employer would not have taken adverse action against the plaintiff had she not been disabled and everything else had remained the same." *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 794 (7th Cir. 1997).

Abbott argues that Tomao cannot demonstrate that similarly situated younger employees were treated more favorably than her, or that her termination was a pretext for unlawful discrimination. The court agrees that Tomao has not established a prima facie case of age

17

discrimination because she has not identified any younger contract laborers who retained their positions after Abbott replaced their contract positions with permanent employees. Indeed, Tomao devotes almost no discussion to this theory of the case.

As for the ADA claim, the evidence demonstrates that Abbott intended to eliminate the contract Asset Technician position once it filled the permanent position. Tomao finds it significant that Whitaker told her she would need to stay on and train Pataska, and that she was fired on April 3, 2002 but Pataska did not begin working as an Asset Technician until June 3, 2002. (Pl. Resp., at 20.) The mere fact that Abbott ended Tomao's contract earlier than anticipated does not raise an inference that it was due to disability (or age) discrimination. Nor does the lack of prior notice signify discriminatory intent. As noted, Abbott clearly intended to terminate the contract position. (Shorman Dep., at 39-40.) In addition, Abbott presented evidence that Shorman extended Tomao's contract in December 2001, and that it expired by its own terms on March 29, 2002. (Def. Facts ¶ 44.) Tomao has not raised genuine issues of fact as to whether Abbott terminated her contract position because of her age and/or disability, and these claims are both dismissed.

## III.   Retaliation

Tomao claims that Abbott terminated her contract Asset Technician position in retaliation for her complaints of discrimination, and failed to hire her for other available positions in July 2003. Abbott argues that both claims are barred because Tomao failed to exhaust her administrative remedies. A plaintiff suing under the ADEA or ADA must first file a charge with the EEOC. *Evoy v. Illinois State Police*, 429 F. Supp. 2d 989, 999 (N.D. Ill. 2006). In pursuing a subsequent federal court action, the plaintiff may only bring those claims that were included in the original charge, that are like or reasonably related to the allegations of the charge, or that grow out of the charge. *Gawley v. Indiana Univ.*, 276 F.3d 301, 313 (7th Cir. 2001). The purpose of this exhaustion requirement is to give the EEOC an opportunity to settle the parties' dispute, and to put the

18

employer on notice of the charges against it. *See, e.g., Horton v. Jackson County Bd. of County Comm'rs*, 343 F.3d 897, 899 (7th Cir. 2003).

Tomao's EEOC charge alleges only age and disability discrimination, and not retaliation. Specifically, Tomao complained that: (1) she was not hired for the permanent Asset Technician position because of her age and disability; and (2) she was then terminated and told not to return to Abbott. (Ex. 1 to Tomao Dep.; Def. Facts ¶ 71.) Abbott's failure to hire Tomao in July 2003, more than a year after Tomao's contract position ended, cannot be construed as like or reasonably related to this January 8, 2003 charge and is dismissed.

Tomao's retaliatory termination claim is a closer call. Tomao does not mention retaliation in her EEOC charge, but the allegations certainly describe the same conduct and implicate the same individuals as the discrimination claims. *See Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). Specifically, Tomao alleges that she was summarily discharged, without notice, after complaining to Whitaker and Faragher about unlawful discrimination with respect to her interview for the permanent Asset Technician position. Tomao also claims that though Pataska did not begin working in that position until June 3, 2002, and Whitaker had told Tomao that he wanted her to train Pataska, Abbott discharged her effective April 3, 2002. The court has carefully reviewed the EEOC investigator's notes and agrees that Tomao complained of discrimination in connection with Whitaker's interview; confirmed that she contacted Faragher to complain about the interview; and also reported that her termination "was handled unusually. That is[,] the way [Abbott] handled someone in a suspected theft or serious conduct." (Ex. 13 to Pl. Facts, at 5-7, 23 and 27 of 37.) The court concludes that this retaliatory termination claim is like or reasonably related to Tomao's asserted discrimination claims and could reasonably be expected to grow out of that investigation. *See Farrell v. Butler Univ.*, 421 F.3d. 609, 616 (7th Cir. 2005) (noting that "this Court has adopted a liberal standard for reviewing the scope of an EEOC charge.") Abbott's motion for summary judgment on this claim is therefore denied.

19

## IV. Promissory Estoppel

Tomao finally asserts a state law promissory estoppel claim, alleging that Abbott promised her the permanent Asset Technician position. To succeed on this claim, Tomao must establish (1) an unambiguous promise of employment communicated to her from Abbott; (2) her reasonable reliance on the promise of employment; (3) the reliance was expected and foreseeable by Abbott; and (4) the reliance was to Tomao's detriment. *Dougherty v. Akzo Nobel Salt, Inc.*, 47 F. Supp. 2d 989, 990 (N.D. Ill. 1999). "A promise is unambiguous if it is 'clear enough that an employee would reasonably believe that an offer has been made.'" *Id.* at 990-91 (quoting *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 115 Ill. 2d 482, 505 N.E.2d 314, 318 (1987)).

Tomao claims that in 1999, Terry Johnson orally promised her a permanent Asset Technician position. According to Tomao, Johnson told her that as long as she performed the necessary work, the company would convert her to a permanent Abbott employee once such a position became available. (Pl. Resp. ¶ 67; Pl. Facts ¶ 5.) Tomao also claims that Whitaker told her to "just hang on, it is being worked on," and that Taylor promised to help her get another job and give her letters of recommendation. (Def. Facts ¶ 67.) All of these alleged promises are too indefinite, as a matter of law, to constitute unambiguous promises of employment. Johnson expressly stated that Tomao could not get a position until one was available, and he left Abbott in July 2000, long before that occurred. In addition, neither Whitaker nor Taylor provided any specific information regarding position, salary, or other terms of employment sufficient to justify any reasonable reliance by Tomao. *See Sembos v. Philips Components*, 376 F.3d 696, 704 (7th Cir. 2004) ("Because Philips did not promise Sembos any specific position, salary, or other terms of employment, it was unreasonable for Sembos to rely on Philips' alleged promise of employment.")

Even assuming these statements did constitute promises of employment, moreover, Tomao has failed to demonstrate that she relied on them to her detriment. There is no evidence that

Tomao refused other employment offers as a result of the alleged promises, or suffered any other detriment whatsoever. *Id.* at 705 (promissory estoppel claim failed where plaintiff "d[id] not claim that the alleged promises prompted him to refuse other job offers.") Abbott's motion for summary judgment on Tomao's promissory estoppel claim is granted.

## CONCLUSION

For the reasons stated above, Abbott's motion for summary judgment [Doc. 29] is granted as to the discriminatory termination, retaliatory failure to hire in July 2003, and promissory estoppel claims, but denied as to the discriminatory failure to hire and retaliatory termination claims. Abbott's motions to strike [Doc. 53, 54] are both granted in part and denied in part consistent with this opinion.

ENTER:

Dated:     AUG 1 6 2006

Nan R Nolan

NAN R. NOLAN
United States Magistrate Judge