**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAROL TOMAO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 3470 |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | Judge Nan R. Nolan |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carol Tomao filed suit alleging that Abbott Laboratories ("Abbott"), incorrectly named as Abbott Laboratories, Inc., failed to hire her as a permanent Asset Technician and terminated her position as a contract Asset Technician because of her age and disability in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Tomao also claimed that Abbott retaliated against her for complaining about the unlawful discrimination, and that she relied to her detriment on Abbott's promise of a job. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and on August 16, 2006, the court granted in part and denied in part Abbott's motion for summary judgment. *Tomao v. Abbott Labs., Inc.*, No. 04 C 3470, 2006 WL 2425332 (N.D. Ill. Aug. 16, 2006). The court found that issues of fact precluded summary judgment on Tomao's claims that (1) she did not receive the permanent Asset Technician position because of her age and/or disability, and (2) she was terminated in retaliation for complaining of discrimination. *Id.* at *7-10, 12. The court granted summary judgment, however, on Tomao's claims of discriminatory termination; retaliatory failure to hire; and promissory estoppel. *Id.* at *10-11, 12-13.

Abbott moved for reconsideration, arguing that the court overlooked Abbott's analysis of Tomao's retaliation claim under the *McDonnell Douglas* burden-shifting approach, and that the court made a mistake of fact in rejecting the company's legitimate, non-discriminatory explanation

for hiring Thomas Pataska as the permanent Asset Technician – i.e., an honest belief that he had the industrial/mechanical experience and communication skills necessary for the position, while Tomao did not. The court denied the motion for reconsideration on October 17, 2006. (Memorandum Opinion and Order of 10/17/06, Doc. 72.)

The court held a jury trial from February 5 through 9, 2007, and on February 9, 2007, the jury returned a verdict in favor of Tomao on all counts. Specifically, the jury found that Abbott (1) discriminated against Tomao because of her age in willful violation of the ADEA; (2) discriminated against Tomao based on her disability with reckless disregard or indifference to her protected rights; and (3) retaliated against Tomao with reckless disregard or indifference to her protected rights. The jury awarded Tomao $300,000 in compensatory damages and $2,400,000 in punitive damages on her disability discrimination claim; and $300,000 in compensatory damages and $3,000,000 in punitive damages on her retaliation claim. The court entered judgment in Tomao's favor consistent with the verdict on February 12, 2007.

Abbott has now filed a motion for judgment as a matter of law or in the alternative for a new trial or a remittitur of damages. Tomao opposes the motion and seeks post-trial equitable relief of back pay, front pay, and liquidated damages. For the reasons explained here, Abbott's motion for judgment as a matter of law or for a new trial is denied. Abbott's motion for a remittitur of damages, and Tomao's motion for equitable relief, are both granted in part and denied in part.

## BACKGROUND[1]

Tomao was born on November 9, 1937 and was over 60 years of age at all times relevant to this action. (Tr. 240.) Tomao started working at Abbott's North Chicago plant on January 19, 1998 as a contract Asset Technician. As a contract worker, Tomao was not an Abbott employee

---

[1] To the extent any background information as stated in the court's August 16, 2006 Opinion was confirmed at trial, the court assumes the reader's familiarity with that earlier decision. *Tomao*, 2006 WL 2425332, at *1-2.

but, instead, was assigned to work at Abbott through an employee placement search company called Mullins & Associates. (Tr. 243.) Tomao's responsibilities included inventorying and tagging new equipment or new parts of equipment, and then inputting that information into a computer database for accountability. (Tr. 244-45, 1004.) *See also Tomao*, 2006 WL 2425332, at *1. At the time, Abbott also employed two other Asset Technicians, Marlene Schreiter (born September 22, 1961) and Theresa Streib (born August 22, 1964), who performed the same duties as Tomao. *Tomao*, 2006 WL 2425332, at *1; (Tr. 1002-03.) The Asset Technicians reported to William Whitaker, Abbott's Asset Administration Group Leader. Whitaker, in turn, reported to Senior Supervisor George Edward Shorman, who reported to Abbott's Section Manager, David Taylor. (Tr. 248, 299, 706-07.)

### A. Tomao's Disability

In June 1999, Tomao was diagnosed with lupus, a disease that causes the immune system to start attacking the body's healthy tissue. (Tr. 264.) By January 2001, she was under the care of Dr. Tammy Utset, Associate Professor of Medicine at the University of Chicago. (Tr. 263, 285.) Dr. Utset confirmed Tomao's lupus diagnosis, and further diagnosed her with secondary Sjögren's syndrome, which causes severe dry eyes and dry mouth; and with fibromyalgia, a chronic musculoskeletal pain condition. (Tr. 268, 270.) Tomao had to miss work approximately one day per month to undergo testing with Dr. Utset, but she found Whitaker to be "very understanding." (Tr. 285-86.)

### B. The Asset Technician Position

Sometime in 2001, Shorman obtained "head count" – i.e., budgetary approval – for a permanent Asset Technician employee. During the trial, the parties strenuously disputed the requirements of this new position. Abbott argued that Shorman submitted a business plan to Dave Taylor proposing a restructure of the Asset Administration Group. Specifically, instead of having three Asset Technicians responsible for three separate maintenance zones (north, central, and

south), the company would assign two Asset Technicians to perform all traditional asset tagging and input duties, and then hire a third Asset Technician to focus on preventative maintenance change requests. (Tr. 562, 563, 568, 569, 572.) Shorman's stated goal was to centralize the preventative maintenance function to obtain more accurate and efficient results. (Tr. 568.) According to Abbott, the new Asset Technician would need strong mechanical and industrial experience, and good communication skills. (Tr. 572.)

Tomao argued that the new Asset Technician did not in fact need any mechanical and industrial experience, noting, for example, that the job description posted on the company intranet said nothing about such skills. (Tr. 963-64, 976-77.) In any event, it was undisputed that Whitaker interviewed Tomao for the position on March 28, 2002, and that he informed her that he had already interviewed a very strong candidate named Thomas Pataska. (Tr. 319, 899.) It was also undisputed that, during the interview, Whitaker asked Tomao whether she thought she could go out there and climb around anymore, and stated that "we all like to feel as if we can do the things we were able to do when we were younger." (Tr. 625-26 (Whitaker).) The parties, of course, offered competing interpretations as to the significance of these statements.

### C.    Tomao's Termination

After the interview, Tomao called Whitaker and Human Resources Manager Lynn Faragher to complain about the way she was treated during the interview. (Tr. 475-76.) Tomao's next day at work was April 2, 2002. (R. 336.) When she got home that evening, there was a voice mail message from Ellen Merritt of Mullins & Associates telling her that her position with Abbott had ended, effective immediately. (R. 341, 366.) Abbott hired Thomas Pataska as its new permanent Asset Technician, though he did not start working in that position until June 3, 2002. (PX 28.) According to Abbott, Pataska had the necessary industrial, mechanical, and communications skills for the job.

### D.    The Jury Verdict

Following a five-day trial, the jury returned a verdict in favor of Tomao on all counts. The jury found that Abbott discriminated against Tomao because of her age and disability, and retaliated against her for complaining of unlawful discrimination. The jury found that these violations were willful and that Abbott had acted with reckless disregard or indifference to Tomao's protected rights. The jury awarded Tomao a total of $600,000 in compensatory damages and $5,400,000 in punitive damages.

Abbott has now filed a motion for judgment as a matter of law or, in the alternative, for a new trial on all of Tomao's claims. In the event these motions are denied, Abbott also seeks a remittitur of damages. Tomao has filed a separate motion seeking an award of back pay, front pay, and liquidated damages.

## DISCUSSION

### I.     Motions for Judgment as a Matter of Law or for a New Trial

The standard for deciding a motion for judgment as a matter of law is "fundamentally the same" as the standard for summary judgment. *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000). The court must determine whether, viewing the evidence in the light most favorable to the party against whom judgment was entered, there was a "legally sufficient amount of evidence from which [the jury] could reasonably derive its verdict." *Id. See also Hall v. Gary Community Sch. Corp.*, 298 F.3d 672, 675 (7th Cir. 2002). The court does not re-weigh the evidence or make credibility determinations, but must ensure that there is more than a "mere scintilla" of evidence to support the verdict. *Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004). In this case, the question is whether Tomao presented enough evidence to permit the jury to conclude that she was the victim of discrimination and retaliation. *Id.* Rule 50 imposes a "high standard for overturning a jury verdict," and judgment as a matter of law is not appropriate unless the court determines that no reasonable jury could have returned a verdict in Tomao's favor. *FMS, Inc. v. Volvo Constr. Equip. North America, Inc.*, No. 00 C 8143, 2007 WL

844899, at *2 (N.D. Ill. Mar. 20, 2007) (quoting *Pierson v. Hartley*, 391 F.3d 898, 903 (7th Cir. 2004)).

Rule 59(a) permits a court to grant a new trial "for any of the reasons for which new trials have heretofore been granted in action at law in the courts of the United States." FED. R. CIV. P. 59(a). *See also ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 543 (7th Cir. 2003). "In practical terms, this means that a new trial should be granted 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience.'" *FMS, Inc.*, 2007 WL 844899, at *2 (quoting *Davis v. Wisconsin Dep't of Corrections*, 445 F.3d 971, 979 (7th Cir. 2006)). *See also Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1367 (7th Cir. 1996) ("A new trial may be granted where the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party.") (internal quotations omitted). A Rule 59(a) motion is not "a vehicle for parties to relitigate issues," but "a device properly used to correct manifest errors of law or fact or to present newly discovered evidence." *S.E.C. v. Koenig*, No. 02 C 2180, 2007 WL 1074901, at *7 (N.D. Ill. Apr. 5, 2007) (internal quotations omitted).

Abbott argues that it is entitled to judgment as a matter of law ("JMOL") or a new trial on all of Tomao's claims because (1) there is no nexus between Tomao's complaint of discrimination and her termination to support a retaliation claim; (2) Tomao did not produce evidence that she was clearly better qualified than Pataska for the Asset Technician position; and (3) there is no evidence that Abbott discriminated against Tomao based on her age or disability. Tomao disagrees, arguing that (1) Abbott is procedurally barred from pursuing a Rule 50 motion because it failed to renew that motion at the end of the trial or state the pertinent legal and factual bases for JMOL; and (2) she presented sufficient evidence to support the jury's verdict in any event.

## A.    Procedural Bar

Tomao argues that Abbott cannot pursue any relief under Rule 50(b) because it did not renew its Rule 50(a) motion at the close of all the evidence, and because its Rule 50(a) motion did not include the specific factual and legal arguments Abbott now advances to support JMOL. (Pl. Resp., at 4-5.)[2] Both arguments fail.

Seventh Circuit case law requires a defendant seeking JMOL to raise a Rule 50(a) motion at the close of the plaintiff's case, and to renew the motion at the close of all of the evidence. *See Eastern Natural Gas Corp. v. Aluminum Co. of America*, 126 F.3d 996, 1000 (7th Cir. 1997) ("[I]n order to preserve a motion for judgment as a matter of law which was not granted by the trial court, the motion must be renewed at the close of all the evidence.") Effective December 1, 2006, however, Rule 50(a) was amended to "delet[e] the requirement that a motion be made at the close of all the evidence." (2006 Advisory Committee Notes.) As the Advisory Committee Notes explain, "[t]his change responds to many decisions that have begun to move away from requiring a motion for judgment as a matter of law at the literal close of all the evidence." (*Id.*) Abbott clearly made a Rule 50(a) motion at the close of Tomao's case. (Tr. 929-31.) In light of the revised Rule 50, the court finds this sufficient to preserve Abbott's right to move for JMOL. *See* FED. R. CIV. P. 50(a)(2) ("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.") *See also Voda v. Cordis Corp.*, No. CIV-03-1512-L, 2007 WL 950365, at *2 n.5 (W.D. Okla. Mar. 27, 2007) ("[T]he current version of Rule 50(b) deletes the requirement that a party can only renew a motion that was made at the close of the evidence. The court would thus be disinclined to deny defendant's motion based on a technicality that the Federal Rules of Civil Procedure now declares to be anachronistic.")

---

[2]     Tomao's Corrected Response in Opposition to Defendant's Amended Motion for Judgment as a Matter of Law or in the Alternative a New Trial or a Remittitur of Damages is cited as "Pl. Resp., at __."

Tomao also argues that Abbott's Rule 50(a) motion did not make the precise arguments it now advances for JMOL. (Pl. Resp., at 5.) Specifically, Tomao claims that Abbott "failed to argue that there was 'no evidence that Abbott took any action against plaintiff after she complained of discrimination' or that Plaintiff's retaliation claim was beyond the scope of the EEOC charge." (*Id.*) Rule 50(a) requires that motions must specify "the law and facts that entitle the movant to the judgment." FED. R. CIV. P. 50(a)(2). "If a ground is not included in a [Rule 50(a)] motion prior to the rendering of the verdict, the moving party waives the ability to challenge whether that issue should have been presented to the jury for consideration." *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99 C 1174, 2004 WL 1613563, at *4 (N.D. Ill. July 19, 2004).

At the close of Tomao's case, Abbott moved for JMOL on the retaliation claim, arguing that Tomao's contract Asset Technician position "terminated pursuant to the contract simply – the contract expired pursuant to an extension in December of 2001; and therefore, nothing that happened in March of 2002 had any bearing on the fact that [Tomao's] position was terminated." (Tr. 931.) Abbott also moved for JMOL on the discrimination claims, arguing a lack of any evidence that Tomao was "clearly better qualified for the position at issue" than Thomas Pataska. (Tr. 930.) Abbott made its theories for JMOL clear in various court documents and at trial, and the court is satisfied that these arguments fairly set forth the law and facts Abbott articulates here in support of JMOL. *See Petit v. City of Chicago*, 239 F. Supp. 2d 761, 767 (N.D. Ill. 2002) ("The Seventh Circuit has held that a failure to expressly state all grounds or expressly state a sufficient argument when the motion is presented at the close of the evidence will not result in waiver if previously presented arguments (in an earlier Rule 50(a) motion, in trial briefs, in motions in limine, on summary judgment, or otherwise) have made the moving party's position clear for the court and opposing party.")

Tomao is correct that in moving for JMOL on her retaliation claim, Abbott did not specifically argue that the claim was beyond the scope of her EEOC charge. (Pl. Resp., at 5.) Abbott did,

however, raise this argument in its motion for summary judgment, and the court agrees with Abbott that such a legal argument may be reviewed even in the absence of a specific Rule 50(a) motion to that effect. *See Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718, 720 (7th Cir. 2003) ("The general rule . . . is that, after a trial on the merits, the court of appeals will not review the district court's earlier denial of a motion for summary judgment" in the absence of a Rule 50(a) motion; however, "if the legal question can be separated from the factual one, then we see no bar to reviewing the legal question notwithstanding the party's failure to raise it in a motion for judgment as a matter of law at trial.")

The court also rejects Tomao's contention that Abbott waived its objection to the retaliation claim by agreeing to the related jury instructions and verdict form. (Pl. Resp., at 9.) Tomao directs the court to *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985), in which a defendant argued that the evidence was insufficient to support a jury's award of damages because the jury was not instructed to exclude arbitration costs. *Id.* at 675. The court noted that the defendant did not propose such an instruction, and held that Rule 51 "requires us to assume that the instructions given were correct; in a civil case each party must live with the legal theory reflected in instructions to which it does not object." *Id.*

More recently, the Seventh Circuit has recognized that "it seems clear that a party need not object to jury instructions to urge a [JMOL] based on different standards." *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1392 n.6 (7th Cir. 1994) (citing *Boyle v. United Technologies Corp.*, 487 U.S. 500, 513-14 (1988)). Here, Abbott does not dispute that the instruction given was correct, but claims that the court erred in denying its motions for summary judgment and for JMOL. In these circumstances, Abbott's failure to object to the accuracy of the instruction does not render it the "law of the case." *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (failure to object to a jury instruction did not render the instruction the "law of the case" where "the focus of petitioner's

challenge is not on the jury instruction itself, but on the denial of its motions for summary judgment and a directed verdict.")

**B.    Retaliation Claim**

Abbott claims that it is entitled to JMOL or a new trial on Tomao's retaliation claim because (1) she did not include such a claim in her EEOC charge; and (2) there is no nexus between Tomao's complaint of discrimination and Abbott's decision to terminate her contract Asset Technician position.  The court considers each argument in turn.

**1.    Scope of EEOC Charge**

A plaintiff suing under the ADEA or ADA must first file a charge with the EEOC.  *Evoy v. Illinois State Police*, 429 F. Supp. 2d 989, 999 (N.D. Ill. 2006).  In pursuing a subsequent federal court action, the plaintiff may only bring those claims that were included in the original charge, that are like or reasonably related to the allegations of the charge, or that grow out of the charge. *Gawley v. Indiana Univ.*, 276 F.3d 301, 313 (7th Cir. 2001).  The purpose of this exhaustion requirement is to give the EEOC an opportunity to settle the parties' dispute, and to put the employer on notice of the charges against it.  *See, e.g., Horton v. Jackson County Bd. of County Comm'rs*, 343 F.3d 897, 899 (7th Cir. 2003).

In its August 16, 2006 Memorandum Opinion and Order denying summary judgment on this issue, the court concluded that though Tomao did not mention retaliation in her EEOC charge, the allegations described the same conduct and implicated the same individuals as the discrimination claims.  *Tomao*, 2006 WL 2425332, at *12 (citing *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994)).  Based on a careful review of the EEOC investigator's notes, the court found that Tomao's retaliatory termination claim was like or reasonably related to her asserted discrimination claims and could reasonably be expected to grow out of that investigation.  *Id.* (citing *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005)).

Abbott did not seek review of this decision in its motion for reconsideration, but it now argues that the court's ruling is "in opposition to settled Seventh Circuit precedent." (Def. Mem., at 7.)[3] In Abbott's view, the Seventh Circuit has made clear that claims of retaliation simply are not "like or reasonably related to" substantive claims of discrimination. In *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720 (7th Cir. 2003), for example, the court held that the plaintiff's sex discrimination and sexual harassment claims were not like or reasonably related to her claim of retaliatory termination because they involved "a separate set of incidents, conduct, and people, spanning over a period of time prior to the filing of her complaint and more than three months prior to her termination." *Id.* at 726-27. *See also Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544 (7th Cir. 1988) (retaliation claim did not fall within the scope of the plaintiff's EEOC charge where "[t]here [wa]s no mention of retaliation or any other words to that effect."); *O'Rourke v. Continental Cas. Co.*, 983 F.2d 94, 97 (7th Cir. 1993) (reversing jury finding of retaliation where the EEOC charge "did not identify the exercise of a protected right or any adverse consequence," and the EEOC did not learn about the earlier discharge and reinstatement until a year later).

The court agrees that generally, retaliation and discrimination claims are not sufficiently related to permit an EEOC charge of one to support a civil suit for another. *Cheek*, 31 F.3d at 501. "An exception exists, however, where such claims are so connected in terms of time, people, and substance that to ignore the connection would undermine the remedial purpose of Title VII in favor of an overly technical application of the law." *Lopez v. Indiana-Kentucky Elec. Corp.*, No. 4:04-CV-0169-DFH-WGH, 2006 WL 3247892, at *10 (S.D. Ind. Aug. 17, 2006) (citing *Sitar*, 344 F.3d at 726-27). In addition, the Seventh Circuit has "adopted a liberal standard for reviewing the scope of an EEOC charge," *Farrell*, 421 F.3d at 616, and cautioned that "[w]hat boxes . . . are checked on the

---

[3]     Defendants' Amended Motion for Judgment as a Matter of Law or in the Alternative a New Trial or a Remittitur of Damages is cited as "Def. Mem., at __."

EEOC form do not necessarily control the scope of a subsequent civil complaint." *Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 368 (7th Cir. 1993).

In her lawsuit, Tomao alleged that she was summarily discharged, without notice, after complaining to Whitaker and Faragher about unlawful discrimination with respect to her interview for the permanent Asset Technician position. The EEOC investigator's notes confirm that Tomao complained of discrimination in connection with Whitaker's interview; that she contacted Faragher to complain about the interview; and that she reported that her termination "was handled unusually. That is[,] the way [Abbott] handled someone in a suspected theft or serious conduct." *Tomao*, 2006 WL 2425332, at *12. Correspondence from Tomao's counsel to Abbott's counsel during the EEOC proceedings, moreover, includes the following statement: "[A]fter [Tomao] had spoken with Abbott Human Resources regarding the problems we have brought to Company's attention, her lock was cut from her Abbott locker, and a recording was left on her home telephone answering machine instructing her not to return to Abbott and advising her that her contract had been canceled." (Letter from W. Provenzano to R. Martinez of 6/17/02, Doc. 39-32, at 17.) All of the events at issue occurred at the same time, and the EEOC charge and the complaint describe the same conduct and implicate the same individuals. *Easley v. Iberia Airlines*, No. 05 C 3760, 2007 WL 625515, at *3 (N.D. Ill. Feb. 23, 2007) (quoting *Cheek*, 31 F.3d at 502). Abbott does not argue that it was in fact prejudiced by the limited EEOC charge, and the court again declines to grant Abbott JMOL or a new trial on the grounds that Tomao did not include a retaliation claim in that document. *Kristufek*, 985 F.2d at 369.

## 2. Nexus Between Complaint of Discrimination and Adverse Action

Abbott argues that even if it were proper for the jury to consider Tomao's retaliation claim, the Company is still entitled to JMOL or a new trial because Tomao did not present any evidence that Abbott terminated her contract Asset Technician position based on her complaints of discrimination. *See Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659,

665 (7th Cir. 2006). In Abbott's view, the Company made the decision to end Tomao's contract on December 7, 2001, months before she complained of discrimination in March 2002. Abbott notes the testimony from Terri Mullins of Mullins & Associates that in December 2001, Abbott extended Tomao's contract only until March 29, 2002. (Tr. 863-64.) Abbott argues that the fact that Tomao's contract expired by its own terms effective March 29, 2002 precludes any finding that Abbott decided to terminate Tomao in response to her subsequent complaints of discrimination. (Def. Mem., at 7; Def. Reply, at 6.)[4]

Tomao, however, points to additional evidence from which the jury could have determined that Abbott retaliated against her. For example, Shorman, Whitaker, and Taylor all denied having any involvement in the decision to terminate Tomao's contract assignment as of March 29, 2002, though they were her direct supervisors. (Tr. 529, 551-52 (Shorman), 721-22, 768-69 (Taylor), 881-82 (Whitaker).) In addition, Whitaker testified that he told Tomao on March 28, 2002 that he would need her to remain in her contract position for two more months in order to train the new Asset Technician. (Tr. 320, 326.) Shorman testified, further, to his understanding that Tomao's contract position would continue until the new position was actually filled, which did not occur until June 2002. (Tr. 553, PX 28.) Mullins, moreover, testified that she had no prior notice that Tomao's contract would not be extended again after March 29, 2002. (Tr. 872.) Indeed, Tomao was scheduled to work on April 1-5 and 8, and she did in fact work a full day on April 2, after her contract had supposedly expired. (Tr. 885, 889.) Tomao also had Abbott parking and security passes that remained valid for several months past the March 29, 2002 date. (Tr. 340-41.)

In addition to casting doubt on Abbott's stated explanation for her discharge, Tomao presented evidence that she complained to Whitaker and Faragher about her discriminatory interview on March 28, 2002, and that Faragher refused to discuss the matter. (Tr. 338-39, 812-13,

---

[4] Abbott's Corrected Reply in Support of its Amended Motion for Judgment as a Matter of Law or in the Alternative a New Trial or a Remittitur of Damages is cited as "Def. Reply, at __."

914.) Notably, Faragher testified that she may have been the person responsible for terminating Tomao's contract position five days later on April 2, 2002. (Tr. 820.) *See, e.g., Lang v. Illinois Dep't of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("Close temporal proximity provides evidence of causation . . . .") The court finds that based on all of this evidence, the jury could reasonably have concluded that Tomao established her claim of retaliation, and that Abbott's explanation that Tomao's contract had simply expired was not credible. Abbott's motion for JMOL or for a new trial on the retaliation claim is denied.

## C. Discrimination Claims

Abbott next argues that the jury's verdict on Tomao's discrimination claims cannot stand because there is no evidence that Abbott selected Thomas Pataska over Tomao for the permanent Asset Technician position because of Tomao's age or disability. The Company first argues that Tomao failed to present any evidence that she was "clearly better qualified for the position at issue." *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738 (7th Cir. 2006) (citing *Ash v. Tyson Foods, Inc.*, 126 S.Ct. 1195, 1197 (2006) (discussing "the standard for inferring pretext from superior qualifications.") As Tomao notes, however, she presented substantial additional evidence aside from qualifications on which the jury could reasonably have based its verdicts.

During Tomao's March 28, 2002 interview, Whitaker asked her if "she thought she would still be able to climb around anymore." When Tomao responded in the affirmative, Whitaker stated that "we all like to think we can do things we could do when we were younger." (Tr. 321 (Tomao), 625-26 (Whitaker).) Abbott notes that Tomao and Whitaker often joked about their age, and characterizes these statements as a mere scintilla of evidence of discrimination. (Tr. 372, 901; Def. Mem., at 12 (citing *Sanghvi v. St. Catherine's Hospital, Inc.*, 258 F.3d 570 (7th Cir. 2001)).) The plaintiff in *Sanghvi*, for example, sought to buy a practice from the defendant hospital. A hospital employee asked the plaintiff, "[b]eing an older, foreign-born physician, how comfortable do you feel dealing with young, white American women?" *Id.* at 573. The Seventh Circuit affirmed summary

judgment for the defendant, viewing the comment as "no more than a scintilla of evidence of . . . discrimination," and insufficient to establish pretext in light of the hospital's showing that (1) after the question was asked, the hospital offered to sell the practice to the plaintiff on the same terms as it offered a competing buyer; (2) the hospital negotiated with the plaintiff in good faith; and (3) the competing buyer secured the practice by agreeing to pay the purchase price in full without financing, a condition the plaintiff was unwilling or unable to satisfy. *Id.* at 576-78.

Unlike the situation in *Sanghvi*, the circumstances surrounding Whitaker's discriminatory comments bolster Tomao's claims of discrimination. For example, Whitaker failed to ask Tomao a single question during the interview about her experience, knowledge, or qualifications for the duties of the permanent Asset Technician position. (Tr. 327, 624-25.) Nor did he accept or review Tomao's resume. (Tr. 320-21, 27, 625.) Indeed, Whitaker admitted during the trial that his meeting with Tomao on March 28, 2002 was "[n]ot really" an interview at all. (Tr. 627.) Whitaker's supervisor, George Shorman, similarly admitted that Tomao was not actually considered for the permanent Asset Technician position:

> Q:    So just so we're clear, [Tomao] was not being considered for the job despite the fact that she was on the candidate pool list, correct?
>
> A:    Yes.

(Tr. 609.) During his interview with Pataska, conversely, Whitaker specifically asked questions about Pataska's industrial maintenance experience and prior work history, and he had a copy of Pataska's resume. (Tr. 624-25.) Abbott insists that Whitaker already knew Tomao's qualifications because he had supervised her work for the previous four years. The jury, however, could reasonably have discounted this explanation in light of Whitaker's admission that Tomao was "not really" interviewed.

The jury also heard conflicting testimony from Abbott managers regarding the reason Tomao was not selected for the permanent Asset Technician position. Whitaker stated that one

explanation the Company offered was the fact that Tomao never applied for the job. (Tr. 914.) It is undisputed, however, that on March 27, 2002, Whitaker sent Tomao an email at Shorman's instruction stating that he would be sending her "an invitation for a 'formal' interview for the Asset Tech position." (Email from W. Whitaker to C. Tomao of 3/27/02; Tr. 319.) *See also Tomao*, 2006 WL 2425332, at *9. Abbott managers also offered conflicting testimony as to whether Tomao was ineligible for the position because her daughter, Denise Weil, was working as a manager in the same division at the time. Specifically, Taylor testified that he told Whitaker that Weil's employment would not create a conflict because she had given notice of her intent to resign. (Tr. 767.) Whitaker testified, however, that Taylor never told him that the conflict had been resolved, and he continued to deem Tomao ineligible for some period of time. (Tr. 914-15.)

Abbott's primary explanation for not hiring Tomao related to a purported change in the Asset Technician position. Shorman, Whitaker, and Taylor all testified that in 2001, Shorman submitted a business plan suggesting that the new permanent Asset Technician be assigned to focus on preventative maintenance change requests, while the existing two permanent Asset Technicians (i.e., Marlene Schreiter and Theresa Streib) continued to perform all asset tagging duties. (Tr. 568, 572, 711, 896.) Shorman testified that he told the recruiting coordinator, Daniel Fletcher, that he was looking for candidates with strong mechanical and industrial experience, and Fletcher testified that he looked for applicants with such experience in screening resumes. (Tr. 578, 963-65.) Whitaker considered Shorman's plan in interviewing candidates, noting that "[t]he person had to have very strong mechanical abilities, a lot of industrial maintenance experience, [and] some electrical maintenance experience." (Tr. 896-97.) According to Marlene Schreiter, moreover, Shorman's business plan actually went into effect; that is, she and Theresa Streib took over all asset tagging duties while Pataska performed tasks related to preventative maintenance. Indeed, Pataska did not even sit with the Asset Technicians as Tomao had done. (Tr. 1004-08.)

On the other hand, Tomao presented evidence undermining the legitimacy of the Shorman business plan. Taylor testified, for example, that Shorman and the other supervisors were not familiar with drafting business plans so those plans "kept changing." (Tr. 755.) Taylor also agreed that

> Q:    [E]ven the final draft wasn't a real plan to do anything; isn't that right?
>
> A:    That's correct.

(Tr. 755-56.) In addition, Taylor acknowledged that Shorman's business plan did not include any statement that mechanical and industrial experience would be required for the new Asset Technician position. (Tr. 747-49.) Nor did the posted job description, which Shorman himself revised in July 2001, say anything about such qualifications. (Tr. 532-34; PX 1; JX 6.) Abbott notes that "[a] manager . . . can want someone with experience over someone who is inexperienced even if the job description does not specifically require experience." *Smith v. Allstate Ins. Corp.*, 24 F. Supp. 2d 870, 876 (N.D. Ill. 1998). To the extent Shorman failed to mention mechanical and industrial experience in his own business plan creating this new Asset Technician position, however, the jury reasonably could have concluded that Shorman's stated desire for such experience was a pretext for discrimination. Indeed, contrary to Schreiter's testimony, Whitaker testified:

> Q:    . . . . Mr. Pataska's job duties were never to go out and do any preventative maintenance on any piece of equipment, were they?
>
> A:    No, they were not.

(Tr. 911.) Whitaker also confirmed that Pataska was never solely responsible for making preventative maintenance decisions; rather, he spoke with the maintenance department and other individuals who had to sign off on all request forms. (Tr. 912.) Based on this evidence, a reasonable jury could have rejected Abbott's claims that the new Asset Technician needed

17

industrial and mechanical experience to perform the job, and that Pataska was better qualified than Tomao for that position.

Abbott stresses still another explanation for the decision to hire Pataska – i.e., Pataska was already a permanent Abbott employee, whereas Tomao was a contract worker. (Def. Reply, at 11.) Taylor testified that "we did give Abbott employees, regular Abbott employees, I would say a priority in consideration." (Tr. 726.) Neither Whitaker nor Shorman, however, said anything about such preferences at trial. *See also Tomao*, 2006 WL 2425332, at *10 (noting that in his deposition, "Whitaker testified . . . that he did not give any preference to Pataska based on his current employee status.") To the extent Taylor was not the individual who made the decision to hire Pataska, the jury acted reasonably in rejecting his stated practice of granting preference to current employees. (Tr. 766.)

Abbott's final arguments in favor of JMOL have been waived for failure to raise them in the Rule 50(a) motion. Abbott may not argue against the verdict based on the fact that the ADA and its regulations sanction inquiries to a job applicant regarding her ability to perform job-related functions. Nor may Abbott secure JMOL based on a stated concern regarding Tomao's absenteeism. (Pl. Resp., at 15-16.) Abbott never made any such arguments at any time prior to filing this Rule 50(b) motion.

In addition, these arguments cannot support Abbott's motion for JMOL or for a new trial in any event. The jury heard testimony that while Whitaker asked Tomao about her ability to perform the functions of the Asset Technician position, he did not pose similar questions to Pataska, the younger and non-disabled applicant. (Tr. 625-26, 627.) In addition, the cases Abbott cites for its position on attendance are easily distinguishable from the facts of this case. In *Waggoner v. Olin Corp.*, 169 F.3d 481 (7th Cir. 1999), the Seventh Circuit held that the ADA does "not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability." *Id.* at 484. *See also Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998)

(plaintiff "neither attended his position for more than eighteen months prior to his termination nor indicated to any St. Rita administrator his intention to return to his teaching position.")  Here, there was no testimony that Tomao's absences were unexplained or erratic, or that they extended for months at a time.  To the contrary, the jury heard evidence that Tomao provided doctor's notes regarding her absences, and that Whitaker was very understanding in signing off on them.  (Tr. 285-87; Jt. EX. 5, 8.)

In sum, the court finds no evidence that the jury verdict regarding age and disability discrimination is against the manifest weight of the evidence, and declines to overturn that verdict or order a new trial.

## II.    Motion for Remittitur of Damages

Abbott argues that the jury's awards of compensatory and punitive damages "are shockingly excessive, redundant, and, in part, unauthorized by law." (Def. Reply, at 13.)  Abbott asks the court to remit the award "to avoid a gross miscarriage of justice and an unwarranted windfall to plaintiff." (*Id.*)  "In determining whether an award is excessive, substantial deference should be given to the decision of the jury and the jury's award should not be disturbed unless it is . . . 'so large as to shock the conscience of the court.'"  *Hare v. Zitek*, No. 02 C 3973, 2006 WL 4069052, at *6 (N.D. Ill. Dec. 28, 2006) (quoting *Morales v. Cadena*, 825 F.2d 1095, 1100 (7th Cir. 1987)).   When considering whether to reduce an award of compensatory damages, courts generally weigh three factors: (1) whether the award is "monstrously excessive"; (2) whether the award has a "rational connection" with the evidence; and (3) whether the award is "roughly comparable to awards made in similar cases."  *Bell v. City of Chicago*, No. 03 C 2117, 2006 WL 1343177, at *5 (N.D. Ill. May 11, 2006) (citing *Deloughery v. City of Chicago*, 422 F.3d 611, 619 (7th Cir. 2005)).  The "monstrously excessive" factor is "simply . . . another way of asking whether there is a rational connection between the award and the evidence."  *Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 713-14 (7th Cir. 2004).

19

Punitive damages are designed to "punish the defendant for reprehensible conduct and to deter him and others from engaging in similar conduct." *Kemezy v. Peters*, 79 F.3d 33, 34 (7th Cir. 1996). An award of punitive damages cannot stand where it is "grossly excessive." In determining whether an award is grossly excessive, courts must consider (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996).

Abbott insists that Tomao's damages must be reduced because (1) the statutory cap on damages under the ADA is $300,000; (2) any liquidated damages award under the ADEA must be offset against the punitive damages awarded under the ADA; (3) the $300,000 compensatory damages award for retaliation is grossly excessive; (4) retaliation claims under the ADA and ADEA do not allow for punitive damages; and (5) assuming punitive damages are allowed under the ADEA, the $3,000,000 awarded here is excessive. The court addresses each argument in turn.

## A.    Statutory Cap and Offset of Liquidated Damages for ADA Claim

The jury awarded Tomao $300,000 in compensatory damages and $2,400,000 in punitive damages on her claim of disability discrimination.[5] The parties agree that the ADA imposes a $300,000 cap on such damages, 42 U.S.C. § 1981a(b)(3)(D), and Abbott does not argue that this total amount is excessive. Neither party, however, addresses the proper method of apportioning the reduced award between compensatory and punitive damages. In *Lust v. Sealy, Inc.*, 383 F.3d 580 (7th Cir. 2004), the Seventh Circuit stated that "the sensible thing for the judge to do is . . . to

---

[5]    The court rejects Abbott's assertion that the jury's $2,700,000 award was for Tomao's combined disability discrimination and retaliation claims. (Def. Mem., at 15.) The agreed verdict form clearly distinguishes between the disability discrimination and retaliation claims, placing each on a separate page with a separate heading.

determine the maximum reasonable award of compensatory damages, subtract that from $300,000, and denote the difference [as] punitive damages." *Id.* at 589.

Abbott did not initially object that the award of $300,000 in compensatory damages was excessive and, instead, merely requested that the total award be reduced to that amount. In a supplemental brief requested by the court, however, Abbott claims that Tomao is entitled to only $50,000 in compensatory damages, with the remaining $250,000 allocated as punitive damages. (Def. Supp., at 3.) Tomao insists that the entire $300,000 award should be deemed compensatory damages. (Pl. Resp., at 32; Pl. Supp., at 2.)

The court finds that an award of $300,000 in compensatory damages for Tomao's ADA discrimination claim is reasonable. [7]Tomao presented evidence that after her sudden termination, she felt dejected and withdrew from family, friends, and social activity. (Tr. 350-51, 498-99.) As Tomao explained, "It was like I had a second home there [at Abbott], and everything was going fine, and then boom. I mean, from one day to the next, you're just completely cut off from everything. It was devastating. I felt awful." (Tr. 350-51.) Tomao also presented evidence that she learned of her termination via a voice mail message from Ellen Merritt of Mullins & Associates. (Tr. 341-42.) According to Tomao, the message stated, "Don't go back to work, don't go anywhere near the premises, your contract has ended, boom." (Tr. 342.) Tomao testified that upon receiving this message, she felt like she "wanted to crawl in a hole and die." Tomao's daughter, Denise Weil, told the jury that after the termination, her mother became depressed and sick more often, and stopped smiling; that "every little bug seemed to get [Tomao], and sometimes she was actually incapacitated"; that she was "crushed" and "her self-esteem was just gone"; and that she stopped going out with friends or relatives, or to church. (Tr. 497-99.) In addition, Tomao experienced severe financial hardship that placed her "immediately at the poverty level." (Tr. 342, 347.) Specifically, she applied for state aid, borrowed significant amounts of money from her daughter,

and incurred large credit card debt, which left her feeling "devastated" and "frightened." (Tr. 347-51.)

In light of this evidence, the $300,000 compensatory damages award is rationally related to the evidence presented, "bear[ing] in mind that our legal system confers on juries the function of placing a value on pain and suffering, both emotional and physical[, and that] [j]udges do not inherently possess more wisdom than jurors in performing this function . . . ." *Deloughery v. City of Chicago*, No. 02 C 2722, 2004 WL 1125897, at *3 (N.D. Ill. May 20, 2004)). *See also Farfaras v. Citizens Bank & Trust Co. of Chicago*, No. 01 C 8720, 2005 WL 670523, at *4 (N.D. Ill. Mar. 21, 2005) ($200,000 award was not "monstrously excessive" where the plaintiff experienced a change in her personality and demeanor; gained weight; had sleepless nights; and withdrew from family and friends).

It is true that Tomao did not seek medical treatment for her emotional harm, but she was depressed for a sustained period of time, and provided testimonial evidence of her emotional pain, suffering, mental anguish, and loss of enjoyment of life. *See David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918, 923 (C.D. Ill. 2002) ("It is well-settled that [ADA] plaintiffs can prove emotional injury by testimony without medical support."); *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1031 (7th Cir. 2003). In addition, Tomao remains unemployed to this date. *Cf. Spina v. Forest Preserve Dist. of Cook County*, 207 F. Supp. 2d 764, 776 (N.D. Ill. 2002) ($200,000 adequately compensated plaintiff for emotional distress arising from sexual harassment, discrimination and retaliation where she never sought mental health treatment and continued to work for the employer); *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 484 (7th Cir. 2003) (award of $75,000 for emotional distress arising from retaliatory discharge in violation of Title VII was reasonable where the plaintiff found a new job two months after the termination); *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068-69 (7th Cir. 2001) (affirming award of $80,185.68 in compensatory damages to plaintiff who was fired in retaliation for filing a workers' compensation claim; plaintiff was unable to find work for nine or ten months). Thus, the award of $300,000 in

compensatory damages for Tomao's claim of discrimination under the ADA is not monstrously excessive and is sustained. Tomao's punitive damages award for this claim is vacated.

Abbott argues that the $300,000 award under the ADA should be reduced further by the amount of any liquidated damages the court awards for Tomao's claim of age discrimination under the ADEA. Abbott directs the court to *Reynolds v. Octel Communications Corp.*, 924 F. Supp. 743 (N.D. Tex. 1995), in which a district court in Texas declined to award a plaintiff liquidated damages under the ADEA where a jury had already awarded her the full $300,000 in compensatory and punitive damages under Title VII. *Id.* at 747. The court explained,

> Were Reynolds to receive both liquidated damages under the ADEA and punitive damages under Title VII, [the defendant] would be punished twice for the same conduct (i.e., terminating Reynolds' employment), because of the jury's finding that that conduct violated both laws.

*Id. See also Bailey v. Container Corp. of America*, 660 F. Supp. 1048, 1052 (S.D. Ohio 1986) ("[T]he jury's verdict awarding to the plaintiff liquidated damages on his federal ADEA claim, and the award of punitive damages on his state law claim constitutes a double recovery.")

Tomao insists that liquidated damages are compensatory, as opposed to punitive in nature. (Pl. Resp., at 33-34.) She notes the Seventh Circuit's statement in *Downey v. C.I.R.*, 33 F.3d 836 (7th Cir. 1994), that:

> This court adheres to the position that ADEA liquidated damages replace prejudgment interest. . . . The rational implication is that as a replacement for prejudgment interest, liquidated damages, as the name implies, compensate a party for those difficult to prove losses that often arise from a delay in the performance of obligations – as a type of contract remedy.

*Id.* at 840. The court also stated, however, that "whatever the appropriate characterization of ADEA liquidated damages (be they punitive or contractual)," they lack "an essential element of a tort-type claim" and, thus, "cannot be excluded from taxation under [26 U.S.C.] § 104(a)(2)." *Id.* To the extent this case does not concern taxation issues, *Downey* is of limited persuasive value. Indeed, the Supreme Court has expressly stated that "[t]he legislative history of the ADEA indicates that

Congress intended for liquidated damages to be punitive in nature." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126 (1985). *See also C.I.R. v. Schleier*, 515 U.S. 323, 331-32 (1995) ("Our holding in *Thurston* . . . requires the conclusion that liquidated damages under the ADEA, like back wages under the ADEA, are not received 'on account of personal injury or sickness.'")

In any event, the court need not resolve this issue because it has reduced Tomao's punitive damages award under the ADA to zero. Abbott's request for further reduction of the $300,000 compensatory damages award is denied. *See Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1170 (10th Cir. 2003) (declining to resolve whether liquidated damages under the ADEA are in fact duplicative of punitive damages awarded under Title VII where the punitive damages award had been remitted to zero).

### B.     Damages for Retaliation Claim

It is undisputed that Tomao cannot recover compensatory or punitive damages for an ADA retaliation claim. *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961, 965 (7th Cir. 2004). The court thus agrees with Tomao that the award of damages for her retaliation claim is properly construed as compensating retaliation under the ADEA. Abbott agreed to the jury instructions, and it would be illogical to ask the jury to determine whether to award compensatory and punitive damages for retaliation under a statute that does not allow for such recovery.

With respect to retaliation under the ADEA, Abbott argues that the $300,000 compensatory damages award is grossly excessive and must be reduced. (Def. Reply, at 14-15.) Abbott also claims that the statute does not allow for the recovery of punitive damages, and that the punitive damages award is unconstitutionally excessive in any event. (Def. Reply, at 15, 22.)

### 1.     Compensatory Damages Award

Abbott seeks a reduction in the compensatory damages awarded for Tomao's ADA retaliation claim. As noted earlier, when considering whether to reduce an award of compensatory damages, courts generally weigh three factors: (1) whether the award is "monstrously excessive";

(2) whether the award has a "rational connection" with the evidence; and (3) whether the award is "roughly comparable to awards made in similar cases." *Deloughery*, 422 F.3d at 619. The "monstrously excessive" factor is "simply . . . another way of asking whether there is a rational connection between the award and the evidence." *Harvey*, 377 F.3d at 713-14.

In its opening brief, Abbott did not challenge the compensatory damages awarded for retaliation, but in its reply memorandum, Abbott argues for the first time, without citation, that "[g]iven the potential for confusion created by the lack of specificity of the jury instruction on retaliation and the patent excessiveness of the award, . . . it would be unduly harsh to foreclose Abbott from arguing that the award is excessive." (Def. Reply, at 15 n.2.) It is well-established that arguments raised for the first time in a reply brief are waived. *United States v. Kelley*, 446 F.3d 688, 692 (7th Cir. 2006). Here, however, the jury's award must be reduced because it is "so large as to shock the conscience of the court," and has no rational connection with the evidence. *Hare*, 2006 WL 4069052, at *6; *Deloughery*, 422 F.3d at 619.

Tomao's evidence supporting compensatory damages is the same for both her disability discrimination and retaliation claims. That is, after her termination, she felt dejected and withdrew from family, friends, and social activity; she received a humiliating voice mail message instructing her not to return to Abbott's premises; she felt like she "wanted to crawl in a hole and die"; and she experienced severe financial hardship that left her "devastated" and "frightened." (Tr. 341-42, 347-51, 498-99.)

Abbott argues that Tomao cannot be compensated for these injuries under the ADEA because she already received appropriate compensation under the ADA. (Def. Reply, at 16.) Abbott directs the court to *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (2d Cir. 1995), in which the Second Circuit considered the damages available to a plaintiff alleging breach of contract and *prima facie* tort against a bank that reduced the plaintiff's line of credit and effectively drove it out of business. *Id.* at 492. A jury awarded the plaintiff $2 million on its breach of contract claim, and

25

an additional $1.25 million on its *prima facie* tort claim. The lower court vacated the $1.25 million award as "duplicative for the same injury" as the contract award. *Id.* at 497. The Second Circuit agreed that "[a] plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery." *Id.* The court reinstated the $1.25 million award, however, finding insufficient evidence that the combined $3.25 million award was in fact duplicative. *Id. See also Tart v. Elementis Pigments, Inc.*, 191 F. Supp. 2d 1019, 1024 n.2 (S.D. Ill. 2001) (compensatory damages awarded for failure to accommodate a disability in violation of the ADA and retaliatory failure to recall for filing a workers' compensation claim were not duplicative).

In this case, Tomao sought damages for unlawful disability discrimination, and for retaliation for complaining of age discrimination. The elements of each claim are different and are intended to redress separate injuries – (1) the emotional distress Tomao suffered because she did not get the permanent Asset Technician position (ADA), and (2) the emotional distress Tomao suffered because she lost her contract Asset Technician position after complaining of discrimination (ADEA). That said, the court agrees with Abbott that only a small portion of Tomao's distress can be attributed to the retaliation claim. It is undisputed that Whitaker told Tomao during her March 28, 2002 interview that the Company was planning to hire Pataska and would keep Tomao in her contract position, at the outside, until the permanent position was filled. (Def. Reply, at 17; Tr. 326, 553.) In other words, Tomao already knew – before she complained of discrimination or suffered any retaliatory action – that her contract position would be ending within a couple weeks or months. Tomao's emotional harm from the retaliatory discharge is therefore limited to a couple weeks or months. (*Id.*)

The jury's award of $300,000 in compensatory damages arising from retaliation translates into approximately $60,000 per year of emotional distress (approximately five years passed between the date of termination and the time of trial, which is $300,000 ÷ 5 years). In the court's view, however, Tomao suffered at most two months of emotional distress from losing her contract

position earlier than expected after complaining of discrimination. The $60,000 per year award works out to $1,153.85 per week ($60,000 ÷ 52 weeks). Eight weeks at $1,153.85 is $9,230.80. Thus, the court remits Tomao's compensatory damages award to $9,230.80, an amount that has a rational connection with the evidence. *Harvey*, 377 F.3d at 713-14.

### 2.    Punitive Damages Under ADEA

Before turning to a discussion of punitive damages in ADEA retaliation cases, the court once again rejects Tomao's argument that Abbott waived its right to challenge the verdict by agreeing to the verdict form and instructions. Whether punitive damages are available in ADEA retaliation cases is a question of law, and the court may properly consider the accuracy and appropriateness of the jury instructions in that regard. *See, e.g., United States v. Jones*, 454 F.3d 642, 650 (7th Cir. 2006) ("When the underlying question of error is one of law, we review a district court's choice of jury instructions *de novo*.") *See also Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749-50 (7th Cir. 1993) (allowing party to raise new ground of review on appeal where "[t]he ground rests entirely on a pure issue of statutory interpretation, as to which the district judge's view, while it would no doubt be interesting, could have no effect on our review, which is plenary on matters of law.")

It is well-established that punitive damages are not available for ADEA discrimination claims. *See Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 773 (7th Cir. 2002) (under the ADEA, "[p]laintiffs may not . . . recover money damages for pain and suffering, nor may they obtain punitive damages.") Tomao argues, however, that an exception exists for ADEA retaliation cases. In *Travis v. Gary Community Mental Health Ctr., Inc.*, 921 F.2d 108 (7th Cir. 1990), the court considered whether a plaintiff could recover punitive damages for retaliatory discharge under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). The court noted that in 1977, Congress amended the remedial section of the FLSA to authorize "such legal or equitable relief as may be appropriate" to effectuate the purposes of the statute. *Id.* at 111. The court observed that "legal" relief is commonly understood to include compensatory and punitive damages, and held that

27

"[c]ompensation for emotional distress, and punitive damages, are appropriate for intentional torts such as retaliatory discharge." *Id.* at 111-12. *See also Soto v. Adams Elevator Equip. Co.*, 941 F.2d 543, 551-52 and n.12 (7th Cir. 1991) (reinstating jury award of compensatory and punitive damages for retaliation claim under the Equal Pay Act, which "is contained within the FLSA as amended.")

A few years later, the court considered whether a professor who was forced to retire at age 70 was entitled to post-retirement income from a defendant that had "interfered with his receipt of such income from other sources." *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279 (7th Cir. 1993). The court noted that the ADEA's remedial template is the FLSA and confirmed that plaintiffs may recover "legal and equitable relief" under the statute. *Id.* at 283. The court also stated that "[a]n exception to the narrow construal of 'legal relief' has been recognized for the case in which the plaintiff charges that he was retaliated against for exercising his rights under the age discrimination law." *Id.* (citing *Travis*, 921 F.2d at 112). In the Seventh Circuit's view, the 1977 amendment to the FLSA retaliation provision "appears to make clear that Congress meant to enlarge the remedies available for such misconduct beyond those standardly available for FLSA (and ADEA) violations." *Id.* at 284. Notably, however, the court did not mention or consider whether the enlarged remedies under the ADEA include punitive damages in particular.

More recently, the Seventh Circuit held in *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729 (7th Cir. 1998), that "punitive damages may be awarded on an FLSA § 216(b) retaliation claim even without a separate award of compensatory damages." *Id.* at 736. The court has not provided further guidance on this issue, but at least one court in this district has concluded that *Travis* and *Moskowitz* provide authority only for the availability of compensatory damages, but not punitive damages. *Eggleston v. South Bend Community Sch. Corp.*, 858 F. Supp. 841, 856 (N.D. Ind. 1994). The Indiana district court noted that "Congress made it clear that punitive damages were

not among the remedies available under the ADEA notwithstanding the expansive language of the remedial section of the statute." *Id.* The court also observed:

> [a] final indication that Congress did not envision punitive damage recoveries is the legislators' statement, made when the ADEA was amended in 1978 to ensure the availability of jury trials on liquidated damages claims, that "the ADEA as amended by this act does not provide remedies of a punitive nature."

*Id.* (quoting *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 148 (2d Cir. 1984)). To the extent "Congress has expressly held that punitive damages are *not* available under the ADEA," the court declined to find such damages available in ADEA retaliation cases. *Id.*

Conversely, a Wisconsin district court recently stated, without explanation, that "[c]ompensatory and punitive damages are not available under the ADEA, except for retaliation claims." *Lyons v. Hader-Seitz, Inc.*, No. 03 C 645, 2005 WL 2077358, at *1 (E.D. Wis. Aug. 19, 2005) (citing *Moskowitz*, 5 F.3d at 283-84). Other courts in this district have noted the split of authority, without resolving the matter. *See Cabin v. Plastofilm Indus., Inc.*, No. 96 C 2564, 1996 WL 496604, at *2 n.3 (N.D. Ill. Aug. 29, 1996) (citing *Moskowitz* and *Eggleston* for the proposition that "[t]here may be some dispute" as to the extent of relief available to a plaintiff in an ADEA retaliation claim, but declining to address the issue.) *See also U.S. E.E.O.C. v. Circuit City Stores, Inc.*, No. 02 C 4672, 2006 WL 1343173, at *10 (N.D. Ill. May 11, 2006) (rejecting plaintiff's assertion that punitive damages are available in ADEA retaliation claims where the party directed the court to only one, irrelevant case).

A few courts outside this district have adopted the reasoning set forth in *Travis*, but only in the context of the FLSA. *See Sines v. Service Corp. Int'l*, No. 03 CIV. 5465 (SC), 2006 WL 3247663, at *2 (S.D.N.Y. Nov. 8, 2006) ("[T]he court finds most persuasive the Seventh Circuit's conclusion that punitive damages are available" for retaliation under the FLSA); *Marrow v. Allstate Sec. & Investigative Servs., Inc.*, 167 F. Supp. 2d 838, 842, 845-46 (E.D. Pa. 2001) (concluding that punitive damages are available in FLSA retaliation cases, but rejecting a comparison with the

ADEA); *Travis v. Knappenberger*, No. CIV. 00-393-HU, 2000 WL 1853084, at *14 (D. Or. Dec. 13, 2000) ("Because the [FLSA] provides that the legal and equitable relief available is 'without limitation,' it may include compensatory and punitive damages.")

The only other circuit court to address the issue has ruled that punitive damages are not available in ADEA retaliation cases. In *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928 (11th Cir. 2000), the Eleventh Circuit rejected the rationale of *Travis* and concluded that punitive damages are not recoverable in FLSA retaliation cases. The court held that damages under the FLSA are intended to compensate plaintiffs, and thus "reject[ed] plaintiff's argument that 'legal relief' includes punitive damages." *Id.* at 934. In the Eleventh Circuit's view, "punitive damages would be out of place in a statutory provision aimed at making the plaintiff whole," and Congress provided for punitive damages as a criminal rather than a civil remedy. *Id.* at 934, 936 (comparing 29 U.S.C. § 216(a) and (b)). The court further confirmed that "[t]he 'legal relief' language in the ADEA is exactly the same as that found in the FLSA," and "conclude[d] that the FLSA should be interpreted similarly to preclude an award of punitive damages." *Id.* at 938.

Several district courts have followed the Eleventh Circuit's position. *See, e.g., Goico v. Boeing Co.*, 347 F. Supp. 2d 986, 997 (D. Kan. 2004) ("[T]he court finds that the *Travis* exception for retaliation claims is not well-founded, and is not a persuasive basis for abandoning the long-standing rule that damages for mental distress and punitive damages are not available on claims under the ADEA."); *Johnston v. Davis Security, Inc.*, 217 F. Supp. 2d 1224, 1232 (D. Utah 2002) ("Although some courts have found it persuasive that punitive damages are available under common law anti-retaliation causes of action, this reasoning does not square with the uniform rejection of punitive damages under the ADEA and the commands to this court to carry out congressional intent."); *Shinwari v. Raytheon Aircraft Co.*, 16 F. Supp. 2d 1308, 1324 (D. Kan. 1998) (holding that the plaintiff "may not recover punitive damages . . . under his ADEA retaliation claim."); *Tucker v. Monsanto Co.*, No. 4:06-CV-1815 (CEJ), 2007 WL 1686957 (E.D. Mo. June 8,

2007) (rejecting *Travis* and following *Snapp* for the proposition that punitive damages are not available under the FLSA).

The Seventh Circuit's position on this issue is not entirely clear, but the court concludes that based on *Travis*, *Soto*, and *Moskowitz*, punitive damages may be recovered in ADEA retaliation cases. In all of these cases, the Seventh Circuit appears to have expressed its belief that by amending the FLSA – the ADEA's remedial template – to authorize "legal" relief "without limitation," Congress sufficiently broadened § 216(b) to support an award of compensatory and punitive damages for retaliation under both the FLSA and the ADEA.

### 3. Tomao's Punitive Damage Award

That does not mean, however, that Tomao is entitled to the full $3,000,000 awarded by the jury. As noted, punitive damages are designed to "punish the defendant for reprehensible conduct and to deter him and others from engaging in similar conduct." *Kemezy*, 79 F.3d at 34. In determining whether an award of punitive damages cannot stand as "grossly excessive," the court must consider (1) the degree of reprehensibility of Abbott's misconduct; (2) the disparity between the actual or potential harm suffered by Tomao and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm*, 538 U.S. at 418; *Gore*, 517 U.S. at 575. Abbott argues that all of these factors require "a very substantial reduction of the punitive damages award." (Def. Reply, at 22.)

### a. Degree of Reprehensibility

The Supreme Court has instructed that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. In assessing this factor, courts must consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial

vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419. According to the Supreme Court, "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* The court finds that punitive damages are appropriate here, but that a significant reduction is warranted.

First, Tomao's harm was primarily economic, as opposed to physical, and there is no evidence that Abbott disregarded anyone's health or safety. Tomao and Dr. Utset both testified that Tomao suffered a "flare" of her lupus "after the stress of stopping working," and it was undisputed that such flares could cause "paralyzing fatigue," joint pain, rashes, achiness, and difficulty concentrating. (Tr. 271, 273-74, 350.) Dr. Utset also testified, however, that it is sometimes "unclear" whether a flare is caused by stress, and there are times where "there's no clear precipitating factors and it's just time for the lupus to flare, and it flares." (Tr. 272.) In addition, Dr. Utset had no specific recollection as to how much time passed between Tomao's termination and her subsequent flare, though she believed it occurred in June of 2002, some two months after the discharge. (Tr. 278-79, 81.) Notably, there was no evidence as to how long the flare lasted, and Tomao conceded that Abbott "was very understanding" when she needed to take time off from work for doctor's appointments. (Tr. 285-86.)

Also weighing in favor of a reduction in punitive damages is the fact that the illegal conduct was an isolated incident. Tomao stresses that Abbott gave conflicting explanations over time for why she could not get the permanent Asset Technician position. (Pl. Resp., at 30.) The only evidence of retaliation, however, relates to Tomao's termination upon complaining of discrimination. Absent evidence of similar, past misconduct, this factor weighs against a finding of reprehensibility. *Cf. State Farm*, 538 U.S. at 423 ("[A] recidivist may be punished more severely than a first offender" because "repeated misconduct is more reprehensible than an individual instance of malfeasance.")

The strongest aspect of Tomao's claim for punitive damages is the fact that she was financially vulnerable and fell "immediately [to] the poverty level" after her termination. (Tr. 347.) Tomao presented evidence that she had to apply for state aid to cover medical expenses; she had to borrow money from her daughter; she could not afford her medications or pay for household expenses; she had to give up her car; and she could not pay her mortgage. (Tr. 347-50.) Abbott is correct that there was no evidence that anyone at the Company knew about Tomao's financial vulnerability. Abbott, however, "has not demonstrated that conduct is reprehensible only if the perpetrator knew about the victim's financial instability." *Interclaim Holdings Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*, 298 F. Supp. 2d 746, 764 (N.D. Ill. 2004). The cases Abbott cites are not to the contrary. *See Kemp v. American Tel. & Tel. Co.*, 393 F.3d 1354, 1363 (11th Cir. 2004) (noting only that the trial court was "justified in finding that AT&T intended to target financially vulnerable individuals given the jury's finding of fraud."); *Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 366 (6th Cir. 2005) (where "actions were a product of mere accident," they could not support a finding of intentional malice).

The final factor also supports a larger punitive damages award. Tomao claims that the jury necessarily found that Abbott intended to retaliate against her because the verdict form asked whether Abbott had "acted with reckless disregard or indifference to" Tomao's protected rights, and the jury checked the box marked "Yes." (Pl. Resp., at 30-31.) Regardless, Tomao presented evidence that Abbott acted with malice in this case. According to Tomao, Abbott's Human Resources Manager, Lynn Faragher, refused to speak with her about her complaints of discrimination, and Faragher herself acknowledged that she did "[n]ot typically" follow up with contract workers who complained of discrimination. (Tr. 339, 816.) Notably, Faragher testified that she may have been the person responsible for terminating Tomao's contract position five days after she complained of discrimination. (Tr. 820.) It is also clear that Abbott was aware of the ADEA and its proscriptions. Whitaker testified that after he interviewed Tomao on March 28, 2002, either

Shorman or Faragher instructed him to document the meeting because there was "a potential problem." (Tr. 634-35.) Shortly thereafter, Whitaker sent a memo to Shorman and Faragher explaining, among other things, why he had discussed Tomao's age during the interview. (Tr. 635; Jt. Ex. 2.) These facts evidence malice and a reckless disregard of Tomao's rights.

Overall, the court finds that the degree of reprehensibility supports a finding of punitive damages, but not in the amount of $3,000,000.

### b. Remaining Factors

The disparity between the compensatory damages award and the $3,000,000 punitive damages award weighs in favor of a significant reduction. There is no "bright-line ratio which a punitive damages award cannot exceed," but "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *State Farm*, 538 U.S. at 425. Here, the ratio of punitive to compensatory damages under the original verdict ($3,000,000 to $300,000) is 10 to 1, which "pushes the outer limits of constitutionality."[6] *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004) (citing *State Farm*, 538 U.S. at 425). In light of the remittitur, moreover, the ratio is a shocking 325 to 1. Tomao has also received significant compensatory damages for her emotional distress; i.e., nearly $10,000 for two months of distress. Such damages "contain [a] punitive element," and "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425, 426.

Finally, Tomao has not cited any comparable cases in this jurisdiction upholding an award of $3,00,000 in punitive damages. In *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936 (7th Cir. 2002), a jury awarded the plaintiff more than $2,000,000 in compensatory damages

---

[6]    The court rejects Tomao's attempt to aggregate the awards among all of her claims in an effort to make the ratio appear smaller (less then 3 to 1). (Pl. Resp., at 31-32.) She cites no authority for this practice, and the court agrees with Abbott that each claim must be viewed separately.

on his claim of retaliatory discharge under Illinois law, based on evidence that the defendants "fabricated complaints and made false evaluations of his job performance"; "took steps to prevent him from filing suit"; and threatened him with discharge both verbally and in writing if he did not stop complaining about defendants' Medicare billing practices. *Id.* at 940, 946. The Seventh Circuit agreed that these "threats, harassment, and coercive tactics" could support an award of punitive damages, but merely remanded the case for a jury trial on that issue. *Id.* at 947.

In *Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657 (6th Cir. 2005), the Sixth Circuit upheld an award of $2.5 million in punitive damages, but on a Tennessee state law claim of intentional infliction of emotional distress ("IIED"), which was not alleged here. *Id.* at 659. Unlike Tomao's retaliation claim, the IIED claim required a showing of conduct that was "outrageous in character" and "utterly intolerable in a civilized community." *Id.* at 664. In *Williams v. ConAgra Poultry Co.*, a jury awarded the plaintiff $6,063,750 in punitive damages on a § 1983 harassment claim. 378 F.3d at 798. The Eighth Circuit found this award excessive, particularly in light of the fact that the plaintiff also received $600,000 in compensatory damages. As the court explained, "[s]ix hundred thousand dollars is a lot of money. Accordingly, we find that due process requires that the punitive damages award on Mr. Williams's harassment claim be remitted to $600,000." *Id.* at 799.

A case more on point is *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219 (7th Cir. 1995), in which a jury awarded the plaintiff $21,000 for the emotional distress he suffered as a result of being fired in retaliation for asserting his right to overtime pay under the FLSA. *Id.* at 1223, 1229. In support of this claim, the plaintiff offered the following testimony: "I gave my best years to this place, and I was thrown like a piece of paper, piece of garbage at the end. . . . And I remember that day I was speechless. I went home. That day I was lucky my wife wasn't there because I was crying." *Id.* at 1227. The court held that "[a]n award of $21,000 is too much for a moment's pang of distress at being fired, even distress enough to make a grown man cry." *Id.* at

1229. The court reduced the award to $10,500 "to keep the award of these damages within the limits of the rational." *Id.* at 1230.

Tomao did present more evidence of emotional distress than the plaintiff in *Avitia*, but most of it is attributable to the discriminatory failure to hire under the ADA. As explained earlier, Tomao's emotional distress stemming from the retaliatory discharge is limited to a maximum of two months. Thus, the court agrees that a punitive award between $10,500 and $21,000 is reasonable in this case. Tomao disagrees, arguing that a large punitive damages award is necessary to deter and punish Abbott, a large corporation with a shareholder net worth in excess of $1 billion. (Pl. Resp., at 33; Tr. 925.) The Supreme Court has instructed, however, that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427. *See also Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (citing *State Farm* for the proposition that "[a] defendant's wealth is not a sufficient basis for awarding punitive damages. . . . That would be discriminatory and would violate the rule of law . . . by making punishment depend on status rather than conduct.")

The court finds that the $3,000,000 punitive damages award is unconstitutionally excessive and should be remitted to $18,461.60, which is double the compensatory damages award. In the court's view, this amount is adequate to punish Abbott without violating due process.[7] *State Farm*, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.")

### III. Motion for Equitable Relief

---

[7] The court rejects Abbott's suggestion that this punitive damages award should be reduced further by the amount of any liquidated damages the court awards for Tomao's age discrimination claim. (Def. Mem., at 16.) Tomao's retaliation claim is intended to redress an unlawful termination, while the discrimination claim redresses an unlawful failure to hire. *Cf. Reynolds*, 924 F. Supp. at 747 (declining to award both liquidated and punitive damages where the Title VII and ADEA claims both sought to redress discriminatory discharge).

Tomao has filed a post-trial motion seeking $236,508.54 in back pay; $236,508.54 in liquidated damages; and $217,416.00 in front pay, for a total of $690,433.08.[8] The court considers each request in turn.

## A.  Back Pay

The purpose of back pay is to put the plaintiff in the same position she would have been in if the discrimination and retaliation had not occurred – i.e., to make her whole. *See Harper v. Godfrey Co.*, 45 F.3d 143, 149 (7th Cir. 1995); *Menchaca v. American Med. Response of Illinois, Inc.*, No. 98 C 547, 2002 WL 48073, at *4 (N.D. Ill. Jan. 14, 2002). Tomao seeks five years of back wages and lost benefits beginning on April 3, 2002, and continuing to the date of final judgment. Abbott insists that Tomao's request is inflated and must be substantially reduced.

### 1.  Lost Wages

In setting forth her calculation for lost wages, Tomao makes several assumptions, including: (1) she would have continued working until at least age 69; (2) her pay rate as of April 3, 2002 would have been $16.37 per hour; and (3) she would have received 4% pay rate increases each year, representing an average of her pay increases between January 1998 and spring 2001. (Pl. Mem., at 4-5.)[9] Based on these assumptions, Tomao seeks $184,423.59 in back wages, as follows:

> $34,049.60 for the period 4/3/02 to 4/5/03 (52 weeks of pay at $654.80 per week)
> $35,411.58 for the period 4/5/03 to 4/5/04 (reflecting 4% pay increase over previous year)
> $36,828.04 for the period 4/5/04 to 4/5/05 (reflecting 4% pay increase over previous year)
> $38,301.16 for the period 4/5/05 to 4/5/06 (reflecting 4% pay increase over previous year)
> $39,833.21 for the period 4/5/06 to 4/5/07 (reflecting 4% pay increase over previous year)

(*Id.*)

---

[8]  The court's discussion of equitable relief covers payments owing from the time of trial through April 5, 2007. The court urges the parties to agree on additional equitable relief Tomao should receive, if any, from April 6, 2007 to the date of this opinion.

[9]  Tomao's Memorandum of Law in Support of Post-Trial Motion Regarding Equitable Relief is cited as "Pl. Mem., at __."

Abbott argues that Tomao cannot recover more than two years of back wages because she failed to present sufficient evidence that she would continue working until age 69. (Def. Resp., at 3-4.)[10] Abbott directs the court to *Finch v. Hercules Inc.*, 941 F. Supp. 1395 (D. Del. 1996), in which a jury awarded $200,000 in back pay to a plaintiff who claimed that he lost his job due to age discrimination. *Id.* at 1401. The plaintiff objected that this figure was too low, arguing that the court erroneously instructed the jury that it was his burden to prove by a preponderance of the evidence the date on which he would have retired from the defendant company. *Id.* at 1418. The court held that the instruction was not erroneous, and that the plaintiff, who was 58 years old at the time of termination and 63 years old at the time of trial, had failed to meet his burden of proving when he would have retired. *Id.* at 1401, 1420. As the court explained:

> The assumption . . . that back pay should be calculated from the date of termination automatically to the time of trial is overly simplistic; this is especially true where, as here, the Court is confronted with a plaintiff who, when the trial takes place, is within the range of what usually is considered normal retirement age. It was singularly within plaintiff's ability to set forth the evidence with respect to his personal mind set on retirement and to enable the jury to decide whether to award back and front pay. Consequently, I believe the burden was properly placed on plaintiff to identify the factual premise upon which his award of damages was to be based.

*Id.* at 1420.

Like the plaintiff in *Finch*, Tomao was 64 years old when she left Abbott and, arguably, close to an age at which she might retire. Tomao testified, however, that she "had planned long before [her March 28, 2002 interview] to work after retirement age," and that as recently as the week before trial in February 2007, she had sent out a resume to Monster.com in an attempt to obtain a job online. (Tr. 325, 350.) Abbott argues that Tomao "provided only the scantiest of evidence that she has attempted to find a job – undermining the necessary showing that plaintiff genuinely desires to continue in the labor force." (Def. Resp., at 4-5.) The Company does not claim,

───────────────

[10]     Abbott's Memorandum of Law in Opposition to Plaintiff's Post-Trial Motion Regarding Equitable Relief is cited as "Def. Resp., at __."

however, that Tomao failed to mitigate her damages in this case. Nor has it provided any evidentiary basis for such an argument. *Schleibaum v. Kmart Corp.*, 153 F.3d 496, 501 (7th Cir. 1998) ("[M]itigation of damages is generally an affirmative defense for which the defendant bears the burden of proof.") The court finds Tomao's evidence sufficient to demonstrate that she intended to continue working at least to age 69.

Abbott next objects to Tomao's assertions that her pay rate in April 2002 would have been $16.37 per hour, and that she would have received annual raises. Abbott notes that Tom Pataska earned only $15.02 per hour when he began working as the permanent Asset Technician in June 2002, and argues that Tomao "has no legitimate evidentiary basis for contending that she would have . . . received raises of 4% each year." (Def. Resp., at 3; PX 28.) Abbott does not offer any alternative calculation or cite any legal authority for this position. Significantly, Abbott concedes later in its memorandum that two years of lost wages would total $69,461.18. (*Id.* at 5.) This amount is reached by adding $34,049.60 and $35,411.58, the figures Tomao offered assuming a higher starting pay rate and a 4% rate increase. The court therefore accepts Tomao's calculation of her lost wages.

Abbott finally claims that the award of lost wages should be reduced by the value of any social security benefits Tomao received. (Def. Resp., at 5 (citing *Flowers v. Komatsu Min. Sys., Inc.*, 165 F.3d 554, 558 (7th Cir. 1999) ("It is within the district court's discretion to set off - or not to set off - social security disability payments" from an ADEA back pay award)). The court disagrees. The Seventh Circuit has stated that allowing a defendant to deduct social security payments from a back pay award would confer on the defendant a "discrimination bonus." *E.E.O.C. v. O'Grady*, 857 F.2d 383, 390 (7th Cir. 1988). *See also Schuster v. Shepard Chevrolet, Inc.*, No. 99 C 8326, 2002 WL 507130, at *6 (N.D. Ill. Apr. 3, 2002). Thus, the court declines to deduct these amounts from Tomao's back pay award, and finds that she is entitled to recover $184,423.59 in lost wages.

### 2.    Lost Benefits

Tomao also seeks an additional $52,084.95 in lost benefits.  First, she seeks to recover five years worth of the following: an annuity equal to 1% of base wages (annual value $327.36); cash profit sharing, averaging three weeks of pay (annual value $1,888.80); and stock retirement plan, consisting of matching up to 2% of base pay in addition to a point system (annual value $1,433.83). These benefits total $18,249.95 from April 5, 2002 through April 5, 2007.[11]  Second, Tomao seeks to recover employer-provided health care coverage in the amount of $33,835.[12]  (Pl. Mem., at 5-6; Weil Aff. ¶ 2.)

Abbott does not dispute that Tomao is entitled to recover lost fringe benefits as part of back pay.  *See, e.g., Rokosik v. City of Chicago, Dep't of Police*, No. 99 C 3587, 1999 WL 966098, at *3 (N.D. Ill. Oct. 13, 1999) (citing *Moskowitz*, 5 F.3d at 283) ("The remedy of backpay under the ADEA has widely been held to include insurance benefits, pension credits and other forms of economic loss."); *E.E.O.C. v. Accurate Mechanical Contractors, Inc.*, 863 F. Supp. 828, 837 (E.D. Wis. 1994) ("Backpay awards under Title VII should include fringe benefits that the claimant would have received absent the employer's discrimination.")   Rather, Abbott objects that Tomao has not presented sufficient evidence to support her claim for these benefits.  (Def. Resp., at 3, 5-8.)

As a preliminary matter, for the reasons already stated, the court rejects Abbott's assertion that lost benefits are only available for a two year period.  (*See supra*, at 39-40.)  Abbott argues that Tomao nonetheless cannot recover any lost benefits because she improperly relies on the affidavit

---

[11]    In her initial memorandum, Tomao also sought (1) vacation pay (annual value $2,076); (2) 60 hours of sick pay at 67% pay (annual value $632.74); and (3) holiday pay for six holidays and three personal days (annual value $1,133.28).  (Pl. Mem., at 5-6.)  Tomao has since agreed to waive recovery of these amounts.  (Plaintiff's Reply in Support of Post-Trial Motion Regarding Equitable Relief ("Pl. Reply"), at 8.)

[12]    Tomao initially sought to recover $50,752.22 in medical expenses, but has since learned that she will only be held responsible for $33,835.00 of that amount.  (Arnold Aff. ¶ 3, Ex. A to Pl. Reply.)

of her daughter, Denise Weil. Weil worked as a Section Manager for North Chicago Maintenance in the Corporate Engineering Division at Abbott from 2000 to 2002, and had management and supervisory responsibilities over employees and contract workers. (Weil Aff. ¶ 1.) In her affidavit, Weil sets forth the fringe benefits Tomao would have received at Abbott each year, based on personal knowledge of those benefits as of 2002. (*Id.* ¶ 2.) Abbott argues that because Weil left the Company in 2002, she is not qualified to discuss benefits offered by the Company in subsequent years. (Def. Resp., at 3.) Again, however, Abbott has not submitted any documentation indicating that Weil's calculations are inaccurate. To the contrary, Abbott concedes at page eight of its memorandum that two years of lost benefits would total $7,299.98. (*Id.* at 5.) This amount is reached by multiplying two years' worth of benefits at Tomao's stated rate of $3,649.99.

Abbott finally argues that Tomao is not entitled to recover the cost of health care coverage she received from the State of Illinois through its publicly funded Medicaid program. Tomao claims that she is responsible for repaying the State $33,835.00, and seeks this as part of her equitable relief. Abbott objects, noting that "[i]n order to recover for lost insurance coverage [on an employment discrimination claim], a plaintiff must show that she either incurred expenses in securing alternative insurance coverage or incurred medical expenses that would have been covered under the employer's insurance program." (Def. Resp., at 6 (quoting *U.S. E.E.O.C. v. Custom Companies, Inc.*, Nos. 02 C 3768, 03 C 2293, 2007 WL 734395, at *14 (N.D. Ill. Mar. 8, 2007).) Abbott claims that Tomao has not met her burden and, thus, cannot recover any amounts for health care coverage. (*Id.* at 5-7.)

The court is satisfied that Tomao has established that she secured alternative coverage with Medicaid;[13] that the State paid $50,752.22 for her medical expenses between July 2002 and May

---

[13] To the extent Tomao testified that she was "immediately at the poverty level" after her termination, and that she has been unable to secure alternate employment, the court is satisfied

7, 2007; and that she is legally responsible for reimbursing the State for $33,835.00 of those expenses. (Arnold Aff. ¶¶ 1-3.) In addition to submitting her own affidavit on this matter, Tomao has submitted an affidavit from William O. Arnold, a Senior Assistant Attorney General in the Illinois Attorney General's Office, Welfare Litigation Bureau, who confirms these facts and provides supporting documentation of Tomao's expenses. (*Id.*) Tomao has also provided an affidavit from Denise Weil confirming that Abbott's health insurance plan would have covered these expenses. (Weil Aff. dated May 23, 2007, Ex. B to Pl. Reply.) Once again, Abbott has not submitted any documentation indicating that Weil is incorrect.

Abbott objects that Tomao has "failed to discount her claim by the value of the employee contributions and/or co-pays for which she would have been responsible had she been covered by Abbott's health insurance program." (Def. Reply, at 7.) According to Weil, Tomao would have had to pay $1,362.40 for her portion of Abbott's health insurance plan. (Weil Aff. ¶ 1(b).) Though it is not clear whether this is an annual or total figure, Abbott has not submitted any documentation from the Company on this issue. Nor has either party provided case law as to whether such premiums are properly deducted from the total award. The court concludes that, based on Tomao's decision to include this figure in an affidavit supporting her claim, the $1,362.40 must be deducted from Tomao's recovery to avoid providing her with a windfall. Thus, Tomao may recover $32,472.60 of the amount she owes the State for medical expenses.

To summarize, Tomao is entitled to a back pay award consisting of (1) $184,423.59 in lost wages; (2) $18,249.95 in lost fringe benefits; and (3) $32,472.60 in medical expenses. Tomao's total backpay recovery is thus $235,146.14.

### B. Liquidated Damages

---

that Medicaid was Tomao's only viable health care option. (Tr. 347.)

The jury found that Abbott acted willfully in violating the ADEA. Abbott does not dispute this finding, and the court agrees that Tomao's evidence is sufficient to support the verdict. (Def. Reply, at 8 n.1.) "An employer commits a willful violation of the ADEA, entitling the plaintiff to liquidated damages, when the employer knows that its conduct is prohibited by the statute or manifests reckless disregard for that possibility." *Appelbaum v. Milwaukee Metropolitan Sewerage Dist.*, 340 F.3d 573, 581 (7th Cir. 2003). Here, Abbott certainly was aware of the ADEA and knew or recklessly disregarded the possibility that its conduct violated the statute. Whitaker testified that, after he interviewed Tomao on March 28, 2002, either Shorman or Faragher instructed him to document the meeting because there was "a potential problem." (Tr. 634-35.) Shortly thereafter, Whitaker sent a memo to Shorman and Faragher explaining, among other things, why he had discussed Tomao's age during the interview. (Tr. 635; Jt. Ex. 2.)

Based on the evidence, Tomao is entitled to an award of liquidated damages equal to the amount of her back pay award. *See Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 777 (7th Cir. 2001) (if an employer acted willfully in violation of the ADEA, "courts are required to assess liquidated damages in the same amount as the compensatory damages.") Thus, Tomao will receive $235,146.14 in liquidated damages.

### C.      Front Pay

Tomao finally seeks an award of front pay in the amount of $217,416.00. "Generally, front pay is awarded as a substitute remedy only when reinstatement is inappropriate." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998). Front pay, which may include future benefits, is "designed to compensate discrimination victims for the reasonable time it would take to find comparable employment elsewhere." *Best v. Shell Oil Co.*, 4 F. Supp. 2d 770, 776 (N.D. Ill. 1998); *Shick v. Illinois Dep't of Human Servs.*, 307 F.3d 605, 614 (7th Cir. 2002). In determining whether to award front pay, the court considers "whether the plaintiff has a reasonable prospect of obtaining comparable employment, whether the time period for the award is relatively short, whether the

plaintiff intended to work or was physically capable of working and whether liquidated damages have been awarded." *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1141 (7th Cir. 1994). An employee may only receive front pay "until such time as [she] can reasonably be expected to have moved on to similar or superior employment." *Best*, 4 F. Supp. 2d at 775 (quoting *Williams*, 137 F.3d at 954). An award of front pay becomes more speculative and "less appropriate" where a plaintiff has received a substantial liquidated damages award and seeks front pay for a lengthy period of time. *Id.*; *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1205 (7th Cir. 1989). The decision to award or deny front pay is within the discretion of the court. *See U.S. E.E.O.C. v. Century Broad. Corp.*, 957 F.2d 1446, 1451 (7th Cir. 1992).

Tomao seeks front pay for a five-year period following her termination. The court agrees that reinstatement is not appropriate given the state of the parties' relationship. *See Williams*, 137 F.3d at 952 (reinstatement may be inappropriate where "there [is] no position available or the employer-employee relationship [is] pervaded by hostility.") Tomao's request for front pay, however, is unduly speculative and cannot be sustained. First, Tomao has received back pay under the assumption that she would have worked until age 69. It is far too speculative to presume further that she will continue working until the age of 74. In *Hybert v. Hearst Corp.*, 900 F.2d 1050 (7th Cir. 1990), for example, a district court awarded the plaintiff five years of front pay on the assumption that he would continue working until he retired at age 72. *Id.* at 1056. In vacating the award, the Seventh Circuit found that "[n]o record evidence speaks to whether advertising space salesmen for magazines like Good Housekeeping generally work to age 72, nor whether Hybert in particular could or would have done so (other than Hybert's "apparent good health" and his "professed willingness")." *Id.*

In this case, similarly, there is no evidence as to whether Asset Technicians generally work to age 75, and Tomao's mere assertion that she would have done so is insufficient. Tomao notes her testimony that after her termination, she sent out many resumes seeking employment, and that

44

just a week before trial, in February 2007, she sent out a resume to Monster.com in an attempt to obtain a job online.  (Tr. 347, 350.)  This single, recent resume on Monster.com in no way proves that Tomao will in fact continue working to age 74.  *Pierce v. Atchison, Topeka and Santa Fe Railway Co.*, 65 F.3d 562 (7th Cir. 1995), cited by Tomao, is not to the contrary.  In *Pierce*, the court upheld an award of ten years of front pay where there was evidence that the "normal retirement age" at the defendant railroad was 65, and that the plaintiff "'was as likely as any and probably more likely than most to work to retirement if he had had the ability to do that' because his job was of 'immense importance' to him and was 'the main source of his sense of who he was and his pride.'"  *Id.* at 574.

Here, conversely, Tomao has not presented any evidence as to the "normal" retirement age at Abbott, and she is seeking front pay extending some ten years beyond age 65.  *Cf. Downes*, 41 F.3d at 1143 n.11 (court was within its discretion in awarding three years of front pay to a plaintiff "in his early sixties.")  Also weighing against an award of front pay is the fact that Tomao has been awarded $235,146.14 in liquidated damages.  *Best*, 4 F. Supp. 2d at 775 (an award of front pay becomes more speculative and "less appropriate" where a plaintiff has received a substantial liquidated damages award and seeks front pay for a lengthy period of time.)  Tomao's request for front pay is denied.

### D.     Summary of Equitable Damages Award

To summarize, Tomao is awarded a total of $470,292.28 in equitable relief.  This includes (1) $184,423.59 in lost wages; (2) $18,249.95 in lost fringe benefits; (3) $32,472.60 in medical expenses; and (4) $235,146.14 in liquidated damages.  Tomao is not awarded any front pay.

### CONCLUSION

For the reasons stated above, Abbott's Motion for Judgment as a Matter of Law or in the Alternative a New Trial [Doc. 120, 124] is denied.  Abbott's motion for a remittitur of damages is granted in part and denied in part as follows: Tomao is awarded $300,000 in compensatory

damages for her ADA claim, and $27,692.40 in compensatory and punitive damages for her ADEA retaliation claim, for a total of $327,692.40. Tomao's Motion Regarding Equitable Relief [Doc. 118] is also granted in part and denied in part. Tomao is awarded back pay and liquidated damages totaling $470,292.28. Tomao's total award is therefore $797,984.68.

Status hearing is set for August 15, 2007 at 9:00 a.m. to discuss fees and costs.


ENTER:

Dated: July 31, 2007

_____
NAN R. NOLAN
United States Magistrate Judge